**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Otis COOPER, Sylvester Graham and
Dennis R. Hoyer,
Defendants-Appellants.**

Nos. 87–2118, 87–2119 and 87–2183.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 14, 1988.

Decided March 1, 1989.

Leslie Chernikov (argued), and Seymour Berger (argued), Detroit, Mich., and Don Ferris (argued), Ann Arbor, Mich., for defendants-appellants.

Kathleen Moro Nesi, and Patricia G. Blake, Asst. U.S. Attys., Larry Bunting, U.S. Attorney's Office, Maura Corrigan (argued), Detroit, Mich., for plaintiff-appellee.

Before ENGEL, Chief Judge, and WELLFORD, Circuit Judge; and THOMAS, Senior United States District Judge.[*]

WILLIAM K. THOMAS, Senior District Judge.

In the District Court for the Eastern District of Michigan, Southern Division, the Grand Jury returned an indictment of thirty-four counts against 37 individuals. Only four of the 37 indicted were tried. Thirty-two pled guilty and one was dismissed. In count one, thirty-six persons were charged with conspiracy from January, 1984 to April, 1987, in violation of 21 U.S.C. §§ 846, and 841(a)(1), to knowingly possess with intent to distribute, and the distribution of, Dilaudid, Percodan, Demerol, Desoxyn and six other identified prescription drugs. As the Court charged the jury, the offense of count one was defined as conspiracy to possess with intent to distribute, and distribution of controlled substances by false prescription. The Court further instructed

---

[*] The Honorable William K. Thomas, Senior District Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

the jury that the "crime of conspiracy to possess with intent to distribute and the distribution of a controlled substance by false prescriptions includes one lesser offense as to Defendant Cooper and Defendant Graham ... conspiracy to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception and subterfuge."

On count one, the jury found Defendant/appellant Dennis Hoyer (hereafter defendant or appellant Hoyer) "guilty of conspiracy to possess with intent to distribute and distribution of controlled substances"; and that the controlled substances, defendant conspired to distribute, were "1, Dilaudid; 2, Percodan; 3, Demerol; 6, Talwin; 7, Ritalin." The jury also found Dennis Hoyer guilty of count two, "illegal use of a communication facility." On count one the jury found Defendant/appellant Otis Cooper (hereafter defendant or appellant Cooper) "guilty of conspiracy to possess with intent to distribute and distribution of controlled substances; 1, Dilaudid." Finally, the jury found Defendant/appellant Sylvester Graham (hereafter defendant or appellant Graham), on count one, "guilty of conspiracy to acquire or obtain possession of a controlled substance by false prescriptions; substances 1, Dilaudid." Defendants Cooper, Graham and Hoyer each appeal their convictions.[1]

## I.

The testimony of George Ray and Denise Ray, his wife,[2] permitted the jury to find these facts, among others. George Ray, his wife, and others, engaged in a scheme of prescription and pill distribution. Prescriptions for pills, including Dilaudid, Demerol, Talwin and other drugs were forged. While George Ray had purchased prescriptions from Linda Fisher's Hubbell Clinic,[3] beginning in July, 1985, he obtained prescriptions from Physicians Comprehensive Health Clinic (PCHC). In a second floor office, in a building on Grand River Avenue at the intersection of Hubbell Avenue in Detroit, the PCHC was run by Denise Ray and Michelle Ferguson with George Ray as overseer. The three owned the Clinic together, the evidence permitted the jury to find.

Ed Williams wrote prescriptions for PCHC, Linda Fisher's Hubbell Clinic, as well as for himself.[4] For verifying some of the PCHC prescriptions, Felton Kennedy received free rent from Denise Ray for his Rex Study Group in space adjoining PCHC. In exchange, when a pharmacy called for prescription verification, Kennedy would verify that "the doctor wasn't in or he was the doctor." There was no doctor at PCHC. Denise Ray and Michelle Ferguson ran the "clinic" on a day-to-day basis. Asked what was the purpose of the "clinic," she said "to sell prescriptions." When asked if there was a "legitimate purpose for the prescriptions you were selling," she answered, "No."

George Ray stated that the prescriptions would contain names of women or men "from the phone book or just out of the sky." He would either sell the prescriptions, known as "busting paper," for a higher price, or fill the prescriptions at pharmacies and sell the "pills." He took the prescriptions to pharmacies where he paid to get the prescriptions filled.

---

1. Defendant Dennis Hoyer was sentenced to four years imprisonment on count one, and four years imprisonment on redacted count two, the sentences to run concurrently. Defendant Otis Cooper was sentenced to three years imprisonment on count one. Defendant Sylvester Graham was sentenced to three years imprisonment on the count one included offense. Defendant John Smith, convicted on count one, was granted acquittal by the trial court.

2. George Ray, one of the 36 defendants indicted under count one, pled guilty to count thirty-three, engaging in a continuing criminal enterprise (21 U.S.C. § 848), for which he was sentenced to 15 years imprisonment. Denise Ray, also indicted under count one, pled guilty, with a 4½ year "cap on the possible term of imprisonment" that she received. In addition, she pled guilty to income tax evasion.

3. Linda Fisher was charged in a different indictment, regarding her Clinics, including Hubbell.

4. Ed Williams was charged and pled guilty to both the Linda Fisher conspiracy indictment, and to the George Ray conspiracy indictment.

George Ray stated that he filled prescriptions at Van Dyke Pharmacy, where defendant Hoyer was pharmacist and part owner. Ray said that he and Hoyer conducted much of their prescription business over the telephone.

The evidence in the case is sufficient for the jury to have found that from mid-July to November, 1985, a conspiracy, including as members at least George Ray, Denise Ray and Michelle Ferguson, existed for the purpose of distributing false prescriptions and pills (controlled substances) by means of a sham clinic. Because proof of the membership of each of the three defendants in this appeal depends, in part, on telephone conversations between George Ray and the defendants that were intercepted and recorded, it is first essential to review the district court's authorization to make the essential wiretaps.

## II.

■ Appellant Hoyer asserts that the trial court committed reversible error in denying his motion to suppress all fruits of electronic surveillance, thereby admitting into evidence at trial wiretapped conversations involving defendant Hoyer and physical evidence (prescriptions) seized pursuant to the November 12, 1985 search warrant, even though it was apparent that the requirements under 18 U.S.C. § 2518 had not been met to properly allow for the issuance of a wiretap order. Appellant Hoyer contends that "ongoing, traditional surveillance methods already in use in this case by the FBI were producing satisfactory results which, in and of itself, would have likely resulted in the eventual indictment of Defendant/Appellant, without the necessity of Federal Agents asking for a court ordered wiretap."

Similarly, appellant Graham contends that the trial court "clearly erred in refusing to suppress the wiretaps because the affidavit in support of the wiretap application failed to establish adequate investigative necessity for the proposed interceptions." Appellant Graham states that he "joined in Defendant George Ray's pretrial motion to suppress the wiretaps," and

Ray's argument that "according to the affidavit, every traditional investigative technique used by the government had proved and was proving successful." Appellant Graham's motion to suppress is directed at four intercepted George Ray telephone conversations with a Sylvester, identified as Sylvester Graham.

Defendant Cooper did not move at pretrial to suppress the intercepted George Ray–Otis Cooper telephone conversations of October 18 and 21, 1985; therefore, the present ground of error under consideration does not apply to the George Ray telephone conversations with Otis Cooper. Likewise, conversations of George Ray with persons other than Dennis Hoyer or Sylvester Graham, transcripts of which were received in evidence, are not the subject of this ground of error.

The telephone conversations of George Ray, intercepted on his residence telephone, were authorized by District Judge DeMascio's order of October 16, 1985 in response to an application of the same date, pursuant to 18 U.S.C. § 2518, and based on an 89 page affidavit of FBI Special Agent Diane E. Ruffino.

The Hoyer and Graham motions to suppress do not challenge Judge DeMascio's Order for lack of probable cause based on the Ruffino affidavit. Rather, they contend that the Ruffino affidavit does not support his finding, as required by 18 U.S.C. § 2518(3)(c), that

normal investigative procedures either have been tried without success and reasonably appear unlikely to succeed if continued, or reasonably appear unlikely to succeed if tried for specific reasons more fully sat forth in the. Application and Affidavit submitted in pursuit of this Order.

The Ruffino affidavit detailed the investigation of illegal prescription sales and distribution of controlled substances in Detroit, which with affiant's knowledge and direction was conducted by the FBI from late 1984 until the application was made to Judge DeMascio for an order authorizing wire and oral interceptions. Affiant Ruffino quoted confidential sources and inter-

views with former employees of one of the "clinics." Undercover operations were conducted, and illegal prescriptions purchased, particularly by one special agent. He engaged in consensual telephone monitoring also. Agents surveilled George Ray as he entered and left several pharmacies. Other investigative techniques included invoice and prescription review.

Thus, the facts submitted to Judge DeMascio established that "normal investigative procedures" had been extensively conducted, and that the requested interception of wire and oral communications was not "employed as the initial step in criminal investigation," *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1827, 40 L.Ed.2d 341 (1974).

Defendant Hoyer notes that "George Ray was seen entering Van Dyke Prescription Center on July 25, 1985 and again on September 12, 1985." Surveillance uncovered this fact, but this was not enough to warrant indictment of Dennis Hoyer. However, to justify tapping George Ray's telephone, this surveillance fact could be added to the hearsay of a former Moreland Clinic employee that "George Ray knows a pharmacist on the east side of Detroit who will fill multiple prescriptions without making inquiry of a physician or the clinic as to whether or not prescriptions were actually dispensed in a legitimate fashion."

Considering the totality of the evidence, Judge DeMascio was entitled to credit the affiant's conclusion that

the interceptions of wire interceptions from telephone numbers (313)865–5288 [George Ray's telephone] ... are essential to bring prosecutable cases concerning street dealers, agents of George Ray and *most notably pharmacists*. (Emphasis added).

There is substantial evidence to support Judge DeMascio's issuance of his Order of October 16, 1985, as to defendant Dennis Hoyer. Appellant Hoyer's contention that the trial court erred in denying his motion to suppress the fruits of the electronic surveillance is rejected and this ground of error is overruled.

The November 12, 1985 search warrant, directed to Van Dyke Prescription Center, obtained four boxes of prescriptions. Issued and served the next day after November 11, 1985, the day of the last wiretap of a George Ray—Dennis Hoyer conversation, the search warrant, and the prescriptions it disgorged, are "fruits of electronic surveillance," as defendant Hoyer asserts. Finding no error in the trial court's overruling of defendant Hoyer's motion to suppress, the search warrant and the seized prescriptions are also not suppressible. The prescriptions were quite relevant and were properly admitted into evidence.

■ In asserting that the trial court erred in failing to grant the George Ray motion to suppress the wiretaps, defendant Graham argues

Because the application was directed against different and separate individuals and clinics, the government had to show in the application that alternative investigative procedures would by inadequate as to each separate putative participant.

This pervasive argument is not available to defendant Graham. *Alderman v. United States*, 394 U.S. 165, 171, 172, 89 S.Ct. 961, 965, 966, 22 L.Ed.2d 176 (1969), upheld the "established principle ... that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." More particularly, *United States v. Williams*, 580 F.2d 578, 583 (D.C. Cir.1978), held

Before an accused may be heard to complain that prosecution evidence should be suppressed because it was come by illegitimately, he must first make out his standing, which generally entails a demonstration that his own interests were affected by the challenged search or seizure.[18] With particular regard to electronic eavesdropping, the accused must show that it was directed at *him*, that the government intercepted *his* conversations, or that the wiretapped communica-

**1510**

tions occurred at least partly on *his* premises.

  •    •    •    •    •

18 *Alderman v. United States*, 394 U.S. 165, 171–174 [89 S.Ct. 961, 965–967, 22 L.Ed.2d 176] (1969).

Hence, defendant Graham has standing to challenge the overruling of the George Ray motion to suppress evidence, in which defendant Graham joined, only with reference to the interceptions of the telephone conversations of George Ray in which Sylvester Graham participated. In considering whether the Ruffino affidavit factually supported the court order that authorized interception of George Ray's telephone calls, including conversations with Sylvester Graham, these observations and affidavit references are relevant.

The Ruffino affidavit disclosed to Judge DeMascio that more than 10 months pursuit of "normal investigative procedures" had revealed that George Ray used his telephone extensively in conducting his illegal prescription enterprise. As the affidavit states

> Prescription customers call ... George Ray, Denise Billingsley Ray or their agents at (313)865–5288 ... to set up the prescription purchases. The prescriptions will then either be sold at the clinics or at George Ray's residence.

Yet, "normal investigative procedures" failed to identify the *"customers and agents"* of George Ray. (Emphasis added). The affidavit next states

> The interceptions from (313)865–5288. ... [George Ray's residence] will reveal to monitoring and surveilling agents the identities of Ray's *customers and agents*, and additionally capture evidence of the sale of prescriptions. (Emphasis added).

Thus, there was a factual basis that warranted the judge, based on these statements of Agent Ruffino, to intercept Ray's telephone calls.

In sum, the Ruffino affidavit sets forth facts which comply with the standard this court set in *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985), approved in *United States v. Alfano*, 838 F.2d 158, 163, 164 (6th Cir.1988)

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

Defendant Graham's ground of error, based on the admission of the wiretapped conversations with him, is overruled.

### III.

### A.

◼ Defendant Hoyer asserts that he was denied "effective assistance of counsel at trial when defense counsel moved to admit, and did in fact have admitted into evidence defendant's exhibits 20–23 (prescriptions seized from Van Dyke Prescription Center under November 12, 1985 search warrant), when in fact said evidence was precisely the same evidence defense counsel had earlier sought to have suppressed in defense motion of August 4, 1987, to suppress fruits of electronic surveillance." The Government counters that this issue has not been adequately developed for appellant review since it was not raised in the district court. The Government cites *United States v. Chapman*, 549 F.2d 1075, 1077 (6th Cir.1977). There, the Court regarded a similar issue as "frivolous" and not properly before the Court "primarily since it was never presented to the District Court." However, on the record before it, the Court found no "lack of due diligence or ineffective assistance of counsel under the Sixth Amendment."

During defendant Hoyer's cross-examination of Special Agent Diane Ruffino, Hoyer's trial counsel moved for admission and the court admitted four boxes of business records of Van Dyke Prescription Center. These boxes, and their contents, had been seized by the Government on November 12, 1985 pursuant to a search warrant. Among the business records were "prescriptions, controlled and non-controlled prescriptions." Prior to trial, counsel for

defendant Hoyer had moved to suppress and exclude "the tangible evidence seized" in the search of the Van Dyke Prescription Center. However, the trial changed the circumstances. The trial court had overruled defendant Hoyer's pretrial motion to suppress. Moreover, counsel for Hoyer recognized, in questioning Special Agent Ruffino, that some of the records (prescriptions) had been "admitted [by the government] separately early on in the trial." The Government having thus gotten some of the prescriptions before the jury, counsel for Hoyer may have determined, as a matter of trial strategy, that the remaining seized prescriptions should be placed before the jury. Moreover, counsel's express reservation of his exception to the trial court's overruling of the motion to suppress demonstrates effective assistance of counsel.[5]

Because the issue of ineffective assistance of counsel was not first raised with the trial court, and because the trial record does not support this claim of error, it is overruled.

### B.

■ Appellant Hoyer further charges reversible error on the part of the trial court in "allowing the jury verdict to stand as to Dennis Hoyer, on the grounds that there was insufficient evidence produced at trial to convict Dennis Hoyer of either charge." With reference to this ground of error and a similar ground of error, which appellant Cooper and appellant Graham each assert, the standard of judicial review is thus prescribed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)

The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

. . . . .

Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

Appellant Hoyer contends

The Government's chief witness against Defendant/appellant, one George Ray, came forth with no testimony to indicate that Defendant/appellant entered into a criminal agreement or understanding with him or any other Co–Defendant in this case. As stated in [*United States v. Thompson*, 533 F.2d 1006, 1009 (6th Cir. 1976)], it is necessary that "the accused willfully became a member of the conspiracy." Defendant/appellant contends that the government was unable to prove this element beyond a reasonable doubt.

Referring to George Ray's testimony, appellant Hoyer asserts

Mr. Ray testified at length regarding his own illicit prescription mill empire (T.T. 8–18–87, p. 148–153) yet Mr. Ray himself admitted that in *all* his dealings with presenting prescriptions to Defendant/appellant for filling, he (Mr. Ray) *never* mentioned to Defendant/Appellant the forged, illicit nature of these prescriptions to Defendant/Appellant (T.T. 8–19–87, p. 76).

While Mr. Ray stated, on cross-examination, that he did not tell Mr. Hoyer the

**5.** On Friday, August 21, 1987, before the jury was called to the courtroom, Mr. Mueller stated

The court will recall that during the testimony of Agent Ruffino yesterday on behalf of Mr. Hoyer, I moved for admission without objection to defendant Hoyer's exhibits 20 through 23, inclusive. I didn't make a statement previously in this regard, so I believe, to preserve the record, the court will recall that the motion to suppress the fruits of electronic surveillance which it has ruled upon included the suppression of the tangible physical evidence

seized on November 12, 1985, from the Van Dyke Prescription Center. The fact that Mr. Hoyer sought to and did in fact have admitted into evidence those specific exhibits should not be interpreted or construed to be a waiver or election by him that would undo or retract the grounds previously stated for the suppression of that evidence. In other words, we are not waiving our previous argument per the motion by offering it during the course of the trial.

prescriptions he took to his pharmacy were forged, there is ample evidence from which the jury could infer that Mr. Hoyer knew they were forged.

Of the thousands of prescriptions that George Ray handled, Ray stated that none were valid. In the early part or middle of 1985, he took his first prescription to Van Dyke Prescription Center. He had bought it from Len Fisher's Westside Medical Clinic. His business with Dennis Hoyer, the Van Dyke pharmacist, grew until he brought as many as 15 to 20 prescriptions at one time to be filled. He took prescriptions there on 20 to 23 occasions.

George Ray explained that a pharmacy would "get tired of having the same type of paper, and they would prefer you to get to different doctors and to get different types of paper." Ray "had started with Westside Medical and [Hoyer] kind of like —he was tired of it, so—and then P.C.H.C. came along, and he liked that, so I furnished him the P.C.H.C." So Ray "got the yellow paper wrote." Surely this testimony permitted the jury to infer that pharmacist Hoyer knew that the doctor's names on the prescriptions were not valid.

Dennis Hoyer filled for George Ray multiple prescriptions during four to five months. He knew that the prescriptions were purported to be for different men or women, but none were for George Ray. For these multiple prescriptions of Dilaudids, Demerols, Percodans, Talwins, and other narcotic drugs, pharmacist Hoyer overcharged George Ray who was buying the drugs to wholesale them. Thus, Ray testified

> I would just explain to him that the ticket was too high tha[n] the wholesale was. He was almost taking the wholesale profit, you know, as far as what the pill was costing. I would just explain to him, he's getting them much cheaper, why should I have to pay a big penalty. One pill cost $.30 cents to him, and I was—have to pay $15 to $13 apiece for that one pill, and we worked it out to come to a round figure of $12 or $11, whatever.

Pharmacist Gerald Bodendistel testified that Dilaudids cost $20 for 30 tablets.

Asked, "it wouldn't be $13 a pill, would it?", he answered, "Hardly."

The jury was entitled to find that pharmacist Hoyer was charging what Ray's drug traffic would bear, and, as Ray testified, over a four to five month period he had spent for the prescriptions filled at Hoyer's pharmacy "roughly about $90,-000." Because of this substantial benefit to defendant Hoyer, well above the normal price for the drugs purchased, the jury was warranted in believing that pharmacist Hoyer knew that Ray's multiple prescriptions and extensive traffic were illegal, that others at the Westside Medical Clinic and the PCHC were participating with Ray in Ray's illegal business, and that defendant Hoyer was furthering Ray's "criminal business" that is, the charged conspiracy.

Defendant Hoyer cites several discrepancies in the lengthy examination of George Ray, the principal government witness, noting that his "credibility was clearly in doubt." Of course, the credibility of witness Ray was an issue for the jury to decide. Tapes of the wiretapped telephone conversations of George Ray and Dennis Hoyer of October 16th through November 11th, were played to the jury. The actual voices and words of Ray and Hoyer not only corroborated testimony of Mr. Ray concerning his dealings with Mr. Hoyer, but also provided additional proof that Mr. Hoyer knew that he was filling forged prescriptions for Mr. Ray.

The tape of November 11, 1985 included this exchange:

> DH: Can you get me some Christmas cards?
>
> GR: Yeah, yeah.
>
> DH: I need some Christmas cards.
>
> GR: Oh I have that covered. umm, the whole, ah, the whole, ah, Christmas line?
>
> DH: Yeah, and, ah, my grandma's, you know.
>
> GR: Yeah, yeah.
>
> DH: Umm.
>
> GR: You, you know how many lottos she was gonna play on it, was she gonna play eight or nine or what?
>
> DH: Ah, today, five.

GR: Five?

DH: Uh-hum.

GR: Mmm.

DH: Today, but it's pressed.

GR: Oh okay.

DH: Make sure that card's pressed.

GR: Okay.

DH: Okay.

After confirming that the voices on the tape were his and Mr. Hoyer's, Mr. Ray was asked about the reference to "some Christmas cards," and what he believed that to be. He answered, "prescriptions." As far as "grand[m]a's," and the question about "lottos," he was asked what that was about. He answered, "the price of the number of pills that I might get from him."

Defendant Hoyer refers to Ray's statements that "Christmas cards" and "grandmother's medicine" were basically code words for narcotic prescriptions which would be available for Mr. Ray. Defendant Hoyer argues that this was "not the case, and the Government presented no substantiation for these statements other than the testimony of a convicted felon (Mr. Ray)." Again, this was a credibility question for the jury to resolve. Hearing Hoyer's and Ray's repeated usage of the terms "Christmas card" and "Grandma's" and "lottos," and same or other terms,[6] the jury was entitled to believe that these terms, were "basically code words for narcotic prescriptions." The use of jargon and code words "is a frequent practice in narcotic dealings," *United States v. Abascal,* 564 F.2d 821, 827 (9th Cir.1977). The use by Hoyer and Ray of code words provided further proof for the jury that Mr. Hoyer was aware that the prescriptions submitted to him by Ray were forged and that he and Ray, along with others, were engaged in the illegal distribution of controlled substances. Considering the evidence against appellant Hoyer, in the light most favorable to the prosecution, the jury, as a rational trier of fact, could have found the essential elements of each of the two crimes charged against him beyond a reasonable doubt.

## IV.

### A.

■ While appellants Cooper and Graham are each affected by the trial court's admission into evidence of the PCHC log book (the blue book), it is appellant Cooper who has challenged the trial court's admission of the log book as a ground of error. George Ray testified that this book contained the information as to "who got the prescriptions ... names the prescriptions was written." When the Government offered the log book (Government's exhibit 10) during the testimony of George Ray, counsel for Otis Cooper, on voir dire, brought out from George Ray that, while he knew the book was at the Clinic, the book was not kept under his direction. The court reserved ruling on Government's exhibit 10.

After Denise Ray identified Government's exhibit 10 as the "record book," and that it was kept for the purpose of "keeping track of the prescriptions," the Government again moved to admit the exhibit.

On voir dire examination by counsel for Otis Cooper, Denise Ray testified that she made entries in the book, but not every day. When she wasn't there, Cathy Moore was designated to take care of the book. While she was unsatisfied by the way Cathy kept the book, she denied that because of "what [Cathy] did, that the book was not

---

**6.** On October 16, 1985, Ray stated "Hey you know where them five big ones gonna be? Twelve, twelve apiece," and Hoyer replied "Oh, yeah?" The government interprets this to mean that Hoyer and Ray discussed the purchase of 500 pills at $12 apiece for a total of $6,000. A tape of October 30, 1985 contains a statement of Hoyer, "Your grandma's stuff should be in later on tonight whenever UPS gets here." In the tape of November 5, 1985, Ray states, "What's the lottery number?" and Hoyer replies, "I don't know. Those white Christmas balls came in for ... [GR: Mmm–Hmm] Hoyer ... for, for your Grandma's house." Later in the same call, Ray asked "what's the lottery ticket number?" and Hoyer replied, "Same as usual. Same price you paid last time." Finally, in the tape of November 7, 1985, Ray states "We gonna send as many cards as we can." Hoyer replies, "Uh, huh. You got a new prescription on your grandma's medicine now." ... she should be up with your medicine, oh, maybe tomorrow or Saturday."

reliable at times and did not have the information that should be there."

Under cross-examination, Denise Ray stated that four persons made entries in the book, "myself, Michelle Ferguson, Ed Williams, and Cathy Moore." Denise Ray and Michelle Ferguson were owners of the Clinic, Ed Williams wrote (forged) its prescriptions, and Cathy Moore was its secretary. The log book kept track of the Clinic's prescriptions to aid in "verifications" should a pharmacist call. The business related purpose of the log book is further evidenced by the book listing various drugs that were the subjects of the prescriptions and its index of different abbreviations for pills, e.g. D2, D3, D4. These abbreviations were used in the log book entries.

Denise Ray testified that the log book entries were organized in several columns. The left margin "usually [set forth] the person's name that either ordered them or someone else ordered them for them, or bought the prescriptions." Names listed in the second column were persons for whom the prescriptions were purportedly written. The book entries are usually dated, and are arranged chronologically. Although some are out of order it appears that the entries were made contemporaneously.

All in all, the evidence supported the trial court's determination that the log book was a record of a "regularly conducted business activity" within the scope of Federal Rules of Evidence 803(6). Neither "the source of information [nor] the method or circumstances of preparation indicate lack of trustworthiness." Since the term "business", as used in Fed.R.Evid. 803(6), includes "business ... and calling of every kind," it matters not that the business of the Clinic was the creation and sale of forged prescriptions. The Trial Court did not err in admitting the log book into evidence.[7]

### B.(1)

The elements of the law of conspiracy are not in dispute. As this court recently stated in a drug case, *United States v. Christian*, 786 F.2d 203, 211 (6th Cir.1986)

> In drug conspiracy cases pursuant to 21 U.S.C. § 846, the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it. (Citation omitted).

As noted, *supra* at pp. 1507, 1508, 1508, the evidence is sufficient for the jury to have found within the scope of count one, as charged, that a conspiracy existed from as early as mid-July to November, 1985, including as members, George Ray, Denise Ray and Michelle Ferguson, and others. Neither defendant Cooper nor defendant Graham denies the existence of this conspiracy. Rather, each contends that there was insufficient evidence as to the element of his "knowing and voluntary" participation in the conspiracy. Once the existence of a conspiracy has been established "only slight additional evidence is required to connect a particular defendant with it." *United States v. Davis*, 809 F.2d 1194, 1205 (6th Cir.1987), quoted from *United States v. Hamilton*, 689 F.2d 1262 (6th Cir.1982). Applying the standards of *Christian*, and *Davis*, the Government contends there is "sufficient evidence to convict the defendants." The court proceeds to consider the evidence separately as to defendants Cooper and Graham, although the evidence at some points overlaps as to these two defendants.

### B.(2)

■ Appellant Otis Cooper asserts that the trial court erred in denying appellant Cooper's motion for acquittal and judgment notwithstanding the verdict. Appellant Cooper contends "that the Government failed to prove Otis Cooper's participation in a conspiracy." Concluding a review of the Government's evidence against him, as he viewed it, appellant Cooper thus assessed that evidence:

---

**7.** A similar record of drug transactions was held to be admissible as business records under Fed. R.Evid. 803(6), even though it was an incomplete record of the defendant's drug dealings, *United States v. Foster*, 711 F.2d 871, 882 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). *See also, United States v. Kasvin,* 757 F.2d 887, 892 (7th Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985).

At most [Otis Cooper] was a visitor at the clinic on one or two occasions. The evidence also indicates at most that Otis Cooper was aware of the Denise Ray/George Ray narcotic enterprise.

To support its contention that there is sufficient evidence to convict Otis Cooper, the Government calls attention to various parts of the evidentiary record.

These facts support the jury's finding of Otis Cooper's guilt. George Ray had known Otis Cooper about two years. George Ray first testified that he didn't sell any prescriptions to Mr. Cooper. But, he modified that, remembering a telephone conversation with his wife (Denise) about Otis. He stated

> She just said Otis was here, and I said yeah, and she said he wanted something, you know. So we discussed what he wanted, and I said it's okay.

As to what they were "giving out that was okay for her to give him" he said, "prescription." The same conversation is fully reported in the October 18, 1985 1:21 P.M.[8] wiretap which begins

> GR: Hey.
>
> DR: Hey, there's a guy here named Otis [at the Clinic].
>
> GR: Yeah, I know Otis, What's happening?
>
> DR: I don't know. He want to talk to you.

The tape, played to the jury in the presence of George Ray,[9] has Otis Cooper saying he "just wanted to catch up with [Ray] on some things," and George Ray responds, "Well, you can get it done if you got the paper." On further direct examina-

tion, Government's counsel asked George Ray to explain some of the statements on the tape. He brought out that Linda's paper, that is Hubbell paper, was also at PCHC. He said that Hubbell paper was white, while PCHC paper was yellow. "Ed [Williams] was working in the Clinic" and was "writing the paper."

Counsel asked him about the reference "you might not get no call but it will work," and Ray said this meant that "I was letting him know that the paper [Hubbell paper] really wasn't no good and if he took it to a pharmacy he couldn't get _____." That explanation proved true, as the later wiretapped conversation of October 21st reveals.

Otis Cooper, who had been at the PCHC on October 14th,[10] returned on October 18th, the intercepted telephone call of that date establishes. But, he did not come as an observer. His intent to buy prescriptions is made plain. George Ray told him, "Have Ed [Williams] to hook you up some of that." Then George Ray said "Ed can do both of them." That is, Ed Williams could write either white Hubbell Clinic prescriptions or yellow PCHC prescriptions. At the end of the conversation, Otis Cooper indicates his assent, "Okay. I'm gonna have to do something."

This exchange provides some evidence that George Ray and Otis Cooper agreed that Otis Cooper would buy prescriptions from Ed Williams, PCHC's prescription writer. But, since the Government concedes that Hubbell Clinic (Linda Fisher's Clinic) is "not part of the instant conspiracy," George Ray's statement that Ed

---

**8.** All of the FBI wiretaps of George Ray's telephone are recorded on the 24 hour clock. For conventional understanding, these times have been converted to A.M. and P.M. readings.

**9.** George Ray identified Otis Cooper in the courtroom and he said it was the same Otis whose voice he heard on the taped telephone conversation.

Appellant Cooper argues that Denise Ray stated that "she does not know if Otis Cooper ever purchased anything at the Clinic." While she was "not sure" that she had a recollection of selling prescriptions to Mr. Otis Cooper, she specifically testified that she had seen Mr. Cooper on three occasions. She saw him in court

and two times at the Grand River Clinic, when he "come to get prescriptions." It was for the jury to determine when, and under what circumstances, Denise Ray had contact with Otis Cooper.

**10.** Denise Ray noted that under date of October 14 (1985) the Clinic log book contained the entry "Otis" in the left margin. The log book lists several names next to "Otis," but no drugs. Since "Otis" appears in the purchaser column, and the names presumably were those for whom the prescriptions were purchased, the Government's argument that Otis purchased prescriptions on October 14th has some support.

Williams could write white Hubbell Clinic prescriptions as well as yellow PCHC prescriptions is not deemed sufficient, standing alone, to permit the jury to find that this statement of Ray and Otis Cooper's response constituted an agreement that Otis was buying PCHC paper; thereby joining George Ray's conspiracy.

Additionally, Otis Cooper's intent to buy paper from Ed Williams, the PCHC prescription writer, is disclosed by a wiretapped phone call from Denise Ray to George Ray later on October 18th. At 3:13 P.M. Denise asked George, "Did Ed [Williams] call you." Later, she told her husband, "I gotta find him because this guy here, Otis is here."

Three days later (October 21st), Otis Cooper reported to George Ray in a wiretapped phone call at 1:01 P.M. that Ed Williams, the PCHC prescription writer "never did show up." Perhaps, because he had been unable to get together with Ed Williams, Otis had gotten some Huball paper "from over at Hubbell." When George Ray told him to take it "back over there" Otis Cooper stated that he had given Linda (the Hubbell Clinic owner) "some money on that already." When Ray asked if he was getting "new paper" from [George], Otis Cooper answered, "yeah, from you." This shows Otis Cooper's intention to buy PCHC paper.

George Ray then put a question, "yeah, I—I—you got the shit from her and it didn't work?" Otis Cooper then tells George Ray what happened. Otis had apparently taken Linda's Hubbell prescription to a pharmacy on Plymouth Avenue and "Doug [Slam]" had refused to take the paper. George Ray then said

Well, I hope he be—be careful with mine 'cause I don't want Doug to do no investigation on mines over there on— Grand River and Hubbell [PCHC].

Otis Cooper responded

I say he ain't going to mess with yours, period. Because he—you know, he got a piece of yours already. He says, 'This is

what I'll take, right here. He showed me a piece of yours [the yellow one].

Otis Cooper added

Yeah, we'll see, that's what he showed me a piece of that. And he said, 'If you can bring me this, I'll serve you right on up.'

When George Ray told him "add them up there" Otis stated, "Well, I'm going to go and take care of that." Thus, Otis Cooper shows his continuing intention to buy "new" PCHC paper from Ed Williams, and a belief that if he brought it to Doug's pharmacy he would "serve [him] right on up."

It is true, as defendant Cooper argues, in substance, that Otis Cooper's purchase of prescription paper from Linda Fisher's Hubbell Clinic, while linking Otis to her conspiracy, would not support a finding that thereby he became a member of George Ray's conspiracy. But, a later wiretap (October 25, 1985, at 2:14 P.M., unequivocally shows that Otis Cooper finally succeeded in purchasing PCHC prescription paper:

GR: Hello.

DR: Yeah. This guy [Sylvester Graham] say he got these prescriptions which Otis had? And he said Otis supposed to have paid some money for them or something. I don't want to have nothing to do with that.

GR: Well, *are they our paper?*

DR: *Yeah.*

GR: Didn't Otis get *some from you all* ?

DR: *Yeah.* The one that ran off he got.

GR: Yeah. He never paid for them?

DR: No. (Emphasis added).

Thus, Denise confirms to George Ray that Otis Cooper had gotten "our paper" (PCHC paper), and Denise confirms that Otis never paid for the prescriptions.

The Clinic log book also provided evidence on which the jury could find that Otis Cooper purchased the paper on October 21st. A PCHC log book entry for October 21, 1985, identified by Denise Ray, permitted the jury to find that on that day Otis Cooper bought PCHC prescriptions. The log book contains the name "Otis," entered in the left margin area where the

names of prescription purchasers are entered. Names of five persons appear next to "Otis," probably the names placed on five different prescriptions. The number of pills were "50, 50, 50, and 50" and the drugs were "Demerol, Dilaudid Fours" and another one that Denise didn't "know." Like other log book entries, the "Otis" entry on October 21st does not include the time of day.

Special Agent Wilson, surveilling PCHC on October 21st, took photos of Otis Cooper and Sylvester Graham both entering and leaving the building in which the Clinic was located. In his testimony of August 20, 1987, he fixes the time of entry at 2:30 P.M., and time of exit at 2:35 P.M.; "about five minutes in the clinic." The next day he returned to the witness stand and, based on his handwritten notes, he stated that Mr. Graham exited at 2:35 P.M., but that "the other person Mr. Cooper exited ten minutes later at 2:45 P.M." Subsequently, he followed Otis Cooper and Sylvester Graham to Detroit Discount Pharmacy at 20908 West Seven Mile Road in Detroit. In his revised testimony, he reaffirmed 3:07 P.M. as their time of departure, but had no record of when they arrived at the pharmacy.

The October 21st log book entry of the sale of prescriptions to Otis Cooper, and the surveillance testimony and photographs of Special Agent Wilson, permitted the Government to argue to the jury, and the jury to find,[11] that the purchase of prescrip-tions entered in the log book on October 21st occurred about 2:30 P.M. But, in reaching its guilty verdict, the jury could have made an alternate finding based on a second appearance of Otis at the Clinic on October 21st.

Three wiretapped telephone calls around 5:00 P.M. on October 21, 1985, culminated in Ed Williams receiving directions from George Ray to sell them [Otis or Billy Green] "5 of them" on credit. Billy Green talked with George Ray at 4:58 P.M. He told him he didn't "need but 4, 5 scrips. All right?" George Ray answered

> Go up there and have Ed to take care of that for you. You all got to hurry up 'cause they're fixing to close.

George Ray then called the Clinic one minute later (4:59 P.M.). He asked, "—did Otis come through," and Denise responded "Yeah." This can be understood to refer to Otis' 2:30–2:45 P.M. appearance at the Clinic. If so, it may be understood to mean that Otis, at that time, purchased the prescriptions which are recorded on October 21st in the log book, with "Otis" in the purchaser column.

George Ray next instructed Denise to tell Ed Williams (when he returned) that "they need 5 sheets until they pull the package out, and they going to bring you your money back." He added "Otis, either him or Billy."

In the third call, at 5:06 P.M., Ed Williams, having returned, calls George

---

**11.** In the wiretap of October 21st, Otis Cooper told George Ray that "Doug Slam," at Detroit Discount Pharmacy on Plymouth Road, had shown Cooper "a piece" of the PCHC yellow paper. Government counsel cited this evidence when he asked the jury to "use its common sense.".... "Thirty days later were they all pulled before the paper was given to the agents of the Federal Government?" Referring to the administrative subpoena served on Detroit Discount, he says "there was not even one piece of [yellow] paper from PCHC," yet "we know from the live reenactment of the tapes that there was a piece of paper, at least one."

Counsel for Defendant/appellant Cooper noted that "nowhere in the box or two boxes of prescriptions from Detroit Discount Pharmacy are there any prescriptions which relate to my client, Otis Cooper." He submitted that "to the extent the prosecutor argues the prescriptions found in one set [Van Dyke Pharmacy] should be used as a basis for finding guilt on someone but the absence of prescriptions in another set should not be relied upon by you in considering guilt or innocence with another client with my client is inconsistent."

It was for the jury to decide the significance of the absence of yellow PCHC prescriptions from the boxes of prescriptions turned over to the Government on November 21, 1985, pursuant to an administrative subpoena served on November 19th on Mr. Schram (mispronounced "Slam") at Plymouth Pharmacy. He also owned Detroit Discount on West Seven Mile Road. If the jury accepted the government's argument the jury might have found that Otis Cooper may have only cashed his Demerol and the unidentified drug prescriptions; and sold the Dilaudid prescriptions to Sylvester Graham.

Ray. He asks "What do you want me to do for Otis?" After learning that Otis was there, George Ray told Ed

Yeah, they supposed to bring the money back tomorrow or later on today, 5 of them, or something like that.

These three tape recordings permitted the jury to reach alternate findings. If the jury had concluded that Otis Cooper's purchase of PCHC prescriptions, as recorded in the log book, occurred between 2:30 P.M. and 2:35 P.M. (when he was seen to enter and leave the Clinic) then the jury was entitled to conclude Otis Cooper later purchased from Ed Williams additional PCHC prescriptions at 5:06 P.M.[12]

If, however, the jury should have decided that Otis Cooper made only one purchase of PCHC prescriptions on October 21st, and that such purchase did not occur at 2:30–2:45 P.M., it could then have decided that the purchase occurred at 5:06 P.M. If so, the log book entry of October 21st, evidencing a sale of prescriptions to Otis, would relate to the 5:06 P.M. purchase.

Whichever alternate set of findings the jury made in reaching its verdict, the findings, as seen, would incorporate Otis Cooper's purchase of PCHC prescriptions on October 21st. This purchase, taken together with Otis' previously expressed intent to buy PCHC prescriptions (yellow paper) from George Ray, permitted the jury to reach the finding that Otis Cooper agreed with George Ray to join and participate in Ray's illegal prescription and pill distribution business and conspiracy. Thereby, he became a member of the conspiracy and acted to further the distribution of the conspiracy's illegal prescription business. His sale to Sylvester Graham of the Dilaudid prescriptions he had purchased from PCHC on October 21st indicated that he was buying the 'scripts to make money. Clearly, the evidence showed that he was more than

a man "desirous of obtaining prescriptions."

In reaching these ultimate findings, the jury could find corroboration in George Ray's testimony under cross-examination by counsel for defendant Cooper

Q. In the course of your business, did you ever combine, conspire, confederate or make any agreement with Mr. Otis Cooper with regard to your business?

A. On occasion.

Q. When was that?

A. A phone conversation.

■ Nor does the evidence, showing that Otis Cooper purchased the PCHC prescriptions on credit, diminish his willful joinder of this criminal conspiracy. Membership in a conspiracy does not turn on whether one pays cash to join a conspiracy or enters it on credit. Moreover, Mr. Cooper's confinement in the Wayne County Jail, from October 22nd at least through October 25th, may have prevented him from making payment for the prescriptions he purchased on October 21st. In short, the jury was entitled to find that, as a member of the George Ray conspiracy, Otis Cooper purchased and distributed false prescriptions for Demerols, Dilaudids (one or more), and an unidentified drug. Since the evidence showed that false prescriptions for controlled substances, issued by PCHC as part of the George Ray conspiracy, could be filled at certain pharmacies, it was not essential for the Government to prove that Otis Cooper actually cashed the false prescriptions he purchased.

Considering the evidence against appellant Cooper, in the light most favorable to the prosecution, the jury, as a rational trier of fact, could have found the essential elements of the charged conspiracy crime beyond a reasonable doubt.

12. The log book records one sale of prescriptions to Otis (Cooper) on October 21st, but does not record a sale to Billy Green. Billy Green, who had asked George Ray at 4:58 P.M. for "4 or 5 scrips," may have been with Otis at the Clinic at 5:06 P.M. although Ed Williams only mentions Otis. Nonetheless, the jury might have found that Billy Green got the "scrips" which Otis purchased from Ed Williams, based on Billy's statement in the October 25th wiretapped call at 2:16 P.M. He says to George Ray, "Okay, the paper I got, you know, for myself, I still got that, okay." If Billy got the "scrips" from Otis, this would be consistent with Otis' purchase of paper from Ed Williams at 5:06 P.M.

### C.(1)

■ Appellant Graham contends that the Trial Court clearly erred by allowing Agent Barenie "to testify that in his opinion Sylvester Graham was the speaker on exhibits 11E,[13] J, K, and L, because there was insufficient evidence for the jury to conclude by a preponderance of the evidence that Agent Barenie was right in his opinion."

Robert S. Barenie, FBI Special Agent, identified the voice of Sylvester Graham on four tapes; Government exhibits 11F, J, K, and L. He has been involved in "15 Title III type, or wire [tap], cases," and has made voice identifications in five to seven of those cases. In one particular case, he had identified the voices of 40 individuals.

Agent Barenie had heard Sylvester Graham speak on three different occasions. The first time was when Graham self-surrendered after the indictment. Due to the circumstances, this conversation was brief. He also talked to him "a couple of times during this proceeding." When asked if he had spoken to Sylvester Graham for a total of approximately 30 seconds, he answered "maybe longer." When asked how he identified a voice that he believed to be Sylvester Graham's, he answered

> From listening to the tape recordings, the intercepts, and comparing that to the same conversation or discussion that I had with this individual, or overheard a discussion with the individual in my presence.

After hearing this testimony, the trial court overruled the objection of counsel for Sylvester Graham and received into evidence Government exhibit 11, including the wiretaps in which the voice of Sylvester Graham was identified.

The likelihood of Sylvester Graham talking with George Ray and Billy Green on October 21 (Government exhibit 11F) is corroborated by Mr. Graham's entry into the building which housed the PCHC on the second floor, 18 minutes after the wiretapped telephone call in which a voice, attributed to Sylvester Graham, had stated "Otis got me the other stuff and I needed your stuff." Agent Barenie makes it evident that identifying the voice of Mr. Graham on the October 21st tape aided him in identifying the voice of Mr. Graham on the three October 25th tapes.

The standard of review for admission of voice identification testimony under Federal Rule of Evidence 901(b)(5), is that there should not be a reversal unless there is a clear showing of abuse of discretion. *United States v. Valencia*, 609 F.2d 603, 640 (2nd Cir.1979). *See also, United States v. Cerone*, 830 F.2d 938, 949 (8th Cir.1987). Applying this standard to the evidence herewith highlighted, the trial court did not abuse his discretion in receiving Agent Barenie's identification testimony "based upon hearing the voice [of Sylvester Graham] at any time under circumstances connecting it with the alleged speaker." Fed.R.Evid. 901(b)(5).

### C.(2)

■ Appellant Sylvester Graham contends that "a review of the evidence against appellant Graham shows, "at most, that he may have made a single purchase of three PCHC prescriptions from Otis Cooper, who had earlier got them from Edsel Williams." To assess the jury's guilty finding against Sylvester Graham, it is essential to review the material facts relating to him.

The jury could begin with the anchored finding that Sylvester Graham made a five minute visit to PCHC on October 21st with Otis Cooper. Sylvester Graham was present in the Clinic from 2:30 P.M. to 2:35 P.M., and Otis remained ten minutes longer. This was followed by their visit to Detroit Discount Pharmacy. The jury also could glean facts from the wiretapped telephone calls.

**13.** Defendant Graham's reference to Government exhibit 11E is actually to Government exhibit 11F, the wiretapped telephone conversation between George Ray, Sylvester Graham and Billy Green on October 21, 1985 at 2:12 P.M. The transcript of August 20, 1987 reveals the marking error. The wiretap of October 21, 1985 at 4:58 P.M. between Billy Green and George Ray, is marked 11G, and the telephone call one minute later between George Ray and Denise Ray is also marked 11G.

**1520**

Sylvester and Billy Green had spoken to George Ray on October 21, 1985, at 2:12 P.M.; 18 minutes before Sylvester and Otis arrived at PCHC. Sylvester Graham told George Ray

SG: Okay. Well—well, Otis got me the other stuff and I needed your stuff. Okay. I've got 10–10 at—10 at Hubbell. But all I need is 3 D's out of—out of your stuff.

After a colloquy concerning Otis' purchase at Hubbell, George Ray told Sylvester

GR: He supposed to be going up there [PCHC, the jury could decide] buying that shit now and straightening it out. Now if not, you can still go up there and get with Ed.

Evidently, Sylvester had not previously dealt with Ed Williams (when Sylvester called him "Eric," George Ray told him the name was "Ed"). George Ray told Sylvester that if Otis "don't bring it all, just go up there and ask for Ed and have Eddie take care of that for you." He located PCHC (Sylvester apparently had not previously been there) "right on the corner next to that glass company." From this conversation the jury could find that Sylvester learned about the Clinic; learned that Ed would provide the paper at the Clinic; and that Sylvester expressed a clear intention to buy 3 D's (Dilaudids) at PCHC.

The jury could have found that Sylvester made a further visit to the Clinic on October 25th at 2:12 P.M. Denise called this visit to George Ray's attention by telephone. She starts off by telling George, "There's some guy here named Sylvester." When George Ray says, "Who?", Denise responds "Billy's friend, Sylvester?". George asks "Well, what he want?", and Denise says, "He says he was Billy's friend." Probably referring to Sylvester's appearance at the Clinic with Otis on October 21st, Denise adds, "He came up here with Otis." George then asks "how much money he going to spend." Denise comes

back, "But, I mean, I don't even know him." Fending off this remark, George Ray instructs Denise "—tell him to get back with you when Eddie call." Denise agrees with an "Okay."

In a follow-up telephone call two minutes later, Denise Ray, George Ray, and Sylvester converse. The conversation, *supra*, at p. 1518, permitted the jury to find that Sylvester had gotten prescriptions from Otis, that the prescriptions were written by PCHC, and that Otis never paid for the paper, getting the paper "on credit." The conversation ends with Sylvester saying

I'm going to pay her what Otis owes. And I need something else. And I'm tired of going through Otis.

George Ray responds

Okay: You ain't got to go through Otis. Just pay her for what you need and roll it from there.

Two minutes later (2:16 P.M.), Billy Green, while talking with George Ray and Denise Ray, is connected to Sylvester Graham. Sylvester brings up his payment to Otis who got "it [paper] on credit." Billy Green tells him "[George] don't want you down there, allright?" Nevertheless, Sylvester talks with George 11 minutes later, at 2:27 P.M. Sylvester tells George Ray to okay the paper that he got from Otis, and Denise took the paper:

"I [Sylvester] paid for Otis ... she got that from me man. The three that I paid for with Otis, I was showing her that I'm cool and she got that. Now I paid him one hundred dollars for that." [14]

Sylvester asked George to tell Denise "Sylvester is coming back" and that he is "on his way there now." George tells him that "[t]here is no way she can do that now because there is nobody to take care, the guy is out on the street that take care of that." Undaunted, Sylvester asks "when can I get took care of? I want to get something else." George Ray tells him to

14. That evening Denise, talking with Michelle Ferguson, describes what happened with this "hypo" who "came from this customer of George's named Otis," and had "paid Otis for the paper.":

He had three sheets in his hand, I took the shit, tore it up and threw it in the garbage. I said, sir I don't know you.

The jury was entitled to believe that she destroyed the paper because Otis had bought it on credit but had not paid for it.

"call [Denise] back in a half hour" and "[a]sk her when Ed is going to be back." Twenty-five minutes later (2:52 P.M.) Denise calls George to learn if the "guy [called] you back ... him and Billy Green." George reports his conversation with Sylvester. Denise then tells George, "I told ya we wasn't selling anything."

If a review of the evidence stopped here there would be plausibility to appellant Graham's argument that "[t]he only agreement that was possibly shown as to Mr. Graham was that he may have had an agreement to purchase three prescriptions from Otis Cooper." However, the evidence includes other facts.

In the October 25th (10:38 P.M.) telephone call, Denise Ray had told Michelle that she "kept telling [Sylvester], I'm not giving you nothing." She makes clear that she is referring to Sylvester Graham. She tells Michelle that "[h]e came from this customer of George's named Otis." Combining this statement with the surveillance identification of Otis Cooper and Sylvester Graham entering the Clinic building together on October 21st, the jury could determine Denise is identifying Sylvester Graham.

On October 25th, at 2:27 P.M., after Denise Ray had taken from Sylvester the three PCHC prescriptions he had bought from Otis Cooper, Sylvester told George Ray he wanted to "get something else," This same Sylvester, i.e., Sylvester Graham, on October 21st, at 2:12 P.M., told George Ray that he needed "three D's outta, outta [his] stuff." These statements of Sylvester Graham permitted the jury to find that he is the "Sylvester" whom Denise Ray is referring to in her oral testimony. Denise testified that the Clinic log book contains an undated entry of a sale of three prescriptions to a Sylvester, appearing after the date of October 22 and before the date of November 1, 1985. Asked "what type of prescriptions are alongside the name of 'Sylvester'?", Denise answered "D4's, D4's, D4's" (Dilaudid 4's).

Thus, the jury could have found that after October 25th, and before November 1st 1985, Sylvester purchased three Dilau-

did 4's prescriptions from PCHC. Denise Ray stated that she did not make the log book entry, which apparently was printed. However, she stated that Cathy Moore, Michelle Ferguson and Ed Williams also made entries in the log book, and "when they printed, [she] couldn't tell the difference." Thus, it may have been that Ed Williams not only wrote the prescriptions for Sylvester, but also entered in the log book the sale of the three prescriptions to Sylvester.

Assumed by the guilty verdict, these factual findings by the jury are sufficient to support the jury's finding that Sylvester willfully joined the George Ray conspiracy. On October 21st, at 2:12 P.M., Sylvester Graham told George Ray that he needed "three D's outta, outta [his] stuff." He made that exact purchase of forged prescriptions of three Dilaudid 4's sometime after October 25th and before November 1st.

The trial court authorized the jury to find Sylvester Graham guilty of a lesser included offense which he instructed was "conspiracy to acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, contrary to the provisions of 843(a)(3) of Title 21 of the United States Code." The jury could and did find Sylvester Graham guilty of this lesser included offense, convinced apparently that he was a part of the George Ray conspiracy, at least to the extent of obtaining possession of three prescriptions of Dilaudid 4's by use of forged prescriptions. As held earlier, the jury was entitled to find that obtaining yellow PCHC prescriptions was tantamount to obtaining the controlled substances that were prescribed.

Pharmacist Gerald Bodendistel, an expert in preparing and dispensing drugs, testified that Dilaudids are "infrequently dispensed" and are "reserved for the very terminally ill, as an example, in the terminal state of cancer." Since defendant Graham's possession of the Dilaudid 4's prescriptions was hardly for personal use, the jury might have decided that his possession

was for distribution.[15]

Appellant Graham argues that circumstantial proof of his membership and participation in the charged conspiracy is not sufficient if it "merely shows the single sale or purchase of narcotics." In support, appellant Graham cites several cases including *United States v. Grunsfeld,* 558 F.2d 1231, 1235 (6th Cir.1977), which noted a "number of cases in which it is generally held that a buyer-seller relationship is not alone sufficient to tie a buyer to a conspiracy." Referring to his purchase of three Cooper prescriptions, and not his own purchase of three Dilaudid 4's prescriptions, appellant Graham argues that his single purchase of three PCHC prescriptions is not enough to link him to the George Ray conspiracy.

However, in *Grunsfeld* the court further notes

an analysis of the case law, however, indicates that where there is additional evidence beyond the mere purchase or sale, from which knowledge of the conspiracy may be inferred, courts have upheld conspiracy convictions.

In addition to proof of his own purchase of three Dilaudid 4's, Sylvester Graham's phone calls to George Ray, expressing his continued desire to purchase George Ray's "stuff," his physical entry with Otis Cooper into PCHC and Detroit Discount Drug on October 21, 1985, and his purchase of three Otis Cooper prescriptions for Dilaudid 4's, sold by PCHC, all provide ample evidence from which Sylvester Graham's "knowledge of the [George Ray] conspiracy," and

participation in the conspiracy, may be inferred.[16]

Considering the evidence against appellant Graham, in the light most favorable to the prosecution, the jury, as a rational trier of fact, could have found the essential elements of the conspiracy crime of which he stands convicted beyond a reasonable doubt.

## V.

■ The trial court is charged with abuse of discretion in denying a motion for mistrial regarding the jury's viewing of U.S. Attorney's notes of defendants' closing argument. The judge's law clerk delivered to the jury requested exhibits including Government's exhibit 10 (the log book, or blue book). As the law clerk was leaving the jury room the jury bell rang again. He was told that "[they] are not supposed to receive this piece of paper." The Assistant United States Attorney conceded that the notes were in his handwriting and were taken "during closing argument by defense." The record indicates that inadvertently the notes were placed in the log book. As the notes are quoted in appellant Graham's brief, a note on the first page reads

"Graham—member of conspiracy.
    *inference 10/25 not there*
    in
    surveillance"

The copy of the second page of the notes begins with "Deal with Otis," and ends with "Discussion of what Otis did in conspiracy."

**15.** As the Government observes, "[b]ecause Graham obtained prescriptions of a highly controlled substance (Dilaudid IV's), which is infrequently dispensed (Gerald Bodendistel August 21, 1987 at Tr. 141–142), on two occasions in less than a week [the PCHC prescription he purchased from Otis Cooper on October 21st and his own prescriptions purchased between October 25th and November 1st]," and "because the second occasion involved the purchase of multiple (three) prescriptions, the jury could infer the large quantity of drugs obtained created an inference of conspiracy to distribute, distribution or simply conspiracy to acquire possession by fraud, 21 U.S.C. § 843(a)(3)." Hence, contrary to defendant Graham's argument, there was sufficient evidence to submit to

the jury the charge of conspiracy to distribute, 21 U.S.C. § 846.

**16.** Among other cases cited, appellant Graham particularly relies on *United States v. Bailey,* 607 F.2d 237, 245 (9th Cir.1979). But, there, the court observed that the wiretapped telephone conversation "proved merely that Moss was a purchaser of narcotics from Bailey," while the Government was required to show that "Moss be connected directly or circumstantially with a larger over-all scheme to distribute narcotics." This latter requirement is met by the proof against defendant Graham of knowledge and participation in the Ray illegal prescription business.

The trial court voir dired the jury in open court. Six jurors saw "this piece of paper." One juror saw the "defendants' names" but did not associate that with anything. Another juror said that she "saw some names and Frank was sitting next to me and he said we better return this real quick." The court thereupon ordered "the jurors to disregard this document" stating that the jury was correct "it was not part of exhibit number 10 and is not to be considered by anyone." Thereafter, the jury returned to the jury room to continue its deliberations.

On the record the court noted that he had voir dired the jury. He then stated

> I am satisfied, firstly, this is a totally innocuous document. These are notes taken by the Assistant United States Attorney during the defendants' closing argument. And I have reviewed this and it is in my opinion an innocuous document.
>
> In addition to that, no juror has read it. In addition to that, I've instructed them all to disregard it and I am denying all motions for mistrial.

All three defendants urge that the United States Attorney's notes were not "an innocuous document." However, this court need not pass on that question. In the recent case of *United States v. Zelinka,* 862 F.2d 92, 95, 96 (6th Cir.1988), this Court again approved *United States v. Pennell,* 737 F.2d 521, 532 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). The *Zelinka* court observed that in *Pennell* it was noted that in *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the Supreme Court rejected the idea that a juror's testimony about her own impartiality is inherently suspect, 737 F.2d at 533.

The *Zelinka* Court then stated

> Four points emerge from our decision in *Pennell:* 1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" [*Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)] is not inherently suspect.

Here, the trial court promptly moved to voir dire the jury once he had learned that the notes of the U.S. Attorney had been found by the jury in Government exhibit 10, and returned by the jury to the law clerk. The trial court overruled the joint motion for a mistrial. Neither at the trial court's hearing, nor in their appellate briefs, do any of the defendants claim or prove that any actual prejudice resulted from the inadvertent inclusion of the U.S. Attorney's notes in the PCHC log book. Applying *United States v. Pennell, supra,* as reaffirmed in *United States v. Zelinka, supra,* it is determined that the defendants have failed to prove that any actual juror bias was caused by 2 of 12 jurors glancing at the names of two of the defendants on the U.S. Attorney's notes. Accordingly, the defendants have not established this ground of error and it is overruled.

With reference to each appellant, each ground of error is denied. The trial court's rulings and the convictions of all three appellants are AFFIRMED.