RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0278p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-2123

JERMAINE BENJAMIN PRYOR,

*Defendant-Appellant.*

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:14-cr-00208—Robert J. Jonker, Chief District Judge.

Decided and Filed: November 22, 2016

Before: GUY, BOGGS, and GRIFFIN, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:** Steven D. Jaeger, THE JAEGER FIRM, PLLC, Erlanger, Kentucky, for Appellant.
B. Rene Shekmer, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for
Appellee.

─────────────────

**OPINION**

─────────────────

BOGGS, Circuit Judge. Before us is a case involving the invocation of the right to self-
representation, voice-identification testimony, and a sentencing enhancement for possession of a
firearm in furtherance of a drug crime. Because we find no error below, we affirm the judgment
of the district court.

1

I

Jermaine Pryor (who calls himself Al Gomono Bey)**¹** was charged with conspiring with three other men to distribute heroin between 2012 and 2014.  The conspiracy operated by having interested persons call a phone number to speak to "Daffy Duck" and negotiate a purchase of heroin.  "Daffy" (allegedly Pryor) would then give a location for the proposed transaction and inform members of the conspiracy of what to bring and where to bring it.  Deputy Chauncey Shattuck listened in on four telephone calls between "Daffy" (now under the nom de guerre "Taz") and an informant in January and February 2014 regarding buying heroin.  Following a drug purchase on February 20 by the informant, police maintained surveillance on the residence where the sale occurred.  While a search warrant was being drafted, a Dodge Magnum arrived and Pryor entered the house.  Police observed Pryor through the window as he picked up money and placed it into a bag, and then returned to his car and left.  Deputy Michael Leasher followed the car from the house until it was stopped by an Ingham County sergeant and deputy for traffic violations.  Pryor was ordered out of the vehicle and the officers observed that he had a .45-caliber Glock pistol holstered inside his waistband.  Pryor informed the officers that he had a proper license for the weapon, which they verified.  After he was handcuffed and patted down, the police discovered wads of money in his pockets.  Pryor was arrested for his connection to the drug transaction.  The police later found in the car a cell phone with a disconnected battery.  They reconnected the battery and turned the phone on.  Shattuck called the number for Taz and the phone rang.

Pryor made thirty-three phone calls while in jail, which were recorded.  In addition, Pryor had a recorded virtual meeting with a visitor via video feed.  Pryor was released, and Shattuck received disks from Detective Brad Delaney that Delaney stated contained recordings of the phone calls from Pryor and the twenty-minute video recording.

Shattuck listened to these phone calls and the video recording (a total of about four hours of conversation) in preparation for further investigation.  In watching the video, Shattuck found

---

**¹**While Jermaine Pryor prefers to be called "Al Gomono Bey," he does not appear to have changed his legal name and the proceedings thus far have referred to him by his given name.  As a result, we refer to the defendant throughout as "Pryor."

that Pryor's voice matched Taz's voice that he had heard earlier, and that the voices on the recordings were the same as that of the prisoner in the video. In late April 2014, Taz called Shattuck and the two spoke briefly. Shattuck then made four controlled drug purchases in July 2014, each time contacting Taz over the phone and discussing the purchase details.

Officer Daniel Batora was also involved in the investigation of the conspiracy. Batora listened to a twenty-minute recording of Pryor's conversation in the last week of April 2014 prior to placing a call on May 1 to a line thought to be one of Taz's ever-changing phone numbers. Batora identified the man on the other end of the line as Pryor and arranged a purchase of heroin. He made a total of three phone calls and purchases of heroin in May 2014.

Pryor was arrested again on December 2, 2014, and brought before a magistrate judge. There, he appeared to object to the jurisdiction of the court, announcing that he had "no contracts with the United States corporation or anybody in this courtroom," and repeatedly ignored the magistrate judge's requests to be quiet. The court adjourned and brought him back the next day to complete his initial appearance. At this appearance, the court asked Geoffrey Upshaw to appear as standby counsel for Pryor and informed Pryor that Upshaw was "here if you wish to consult with him, but he d[id] not yet" represent him. Pryor responded that he was "never going to consult with" Upshaw. He then began to object to the jurisdiction of the court, explaining that he was "not a part of your society. . . . I am a moor, and your laws d[o]n't apply to me."[2] The magistrate judge informed Pryor of his right to the assistance of counsel, and that counsel would be appointed at no cost if he could not afford representation. Pryor immediately stated "I don't consent to that." When the magistrate judge asked if he understood that counsel could be appointed for him, Pryor replied that he did not. The magistrate judge then inquired if Pryor was asking the court to appoint counsel, and Pryor denied consent to the court's jurisdiction. The magistrate judge repeated his question, and Pryor answered "No. I don't have—no, I don't consent to anything." When asked if he intended to hire his own attorney, Pryor indicated that he would not: "Why would I—I am not a minor and no one . . . will be talking for me." Again, the magistrate judge repeated his question, and Pryor repeated his answer, saying "I'm not a

---

[2]Pryor's arguments were consistent with a branch of the "sovereign citizen" movement, an ideology that rejects the legitimacy of United States jurisdiction over its adherents. *See, e.g.*, Michael Crowell, *A Quick Guide to Sovereign Citizens*, Admin. Just. Bull. (UNC Sch. of Gov't, Chapel Hill, N.C.), Nov. 2015.

minor and I don't need anyone to talk for me." After being read the charges against him and asked if he understood them, Pryor said he did not. He repeated his denial of the court's jurisdiction ("I'm not a part of your society. Your laws d[o]n't apply to me."). Citing Pryor's "bizarre[]" behavior, the magistrate judge ordered that Pryor be referred to the Bureau of Prisons for a competency evaluation.

At the competency hearing on March 16, 2015, Pryor objected to being in court "under direct duress and coercion," but indicated that he was appearing "*in propria persona*." The magistrate judge observed that he had now appointed Upshaw as Pryor's counsel, at least for the duration of the competency hearing, and Upshaw noted that Pryor did not wish for him to speak on his behalf. Pryor objected, but was warned that he would be removed from the courtroom if he continued to speak out of turn. Based on the competency report, the court found that Pryor was competent to proceed in his case. When the court was advising Pryor of his rights, Pryor repeatedly answered questions with questions of his own. The court stated: "If you are either unable or unwilling to answer my questions, I will have no alternative but to keep Mr. Upshaw on as counsel. You cannot represent yourself if you will not cooperate with the Court in answering questions." The court directly asked Pryor, "do you wish to represent yourself or do you wish to have counsel represent you?" Pryor answered "I will be myself" and again challenged the court's jurisdiction. The court repeated the question, and Pryor asked if the judge was offering him a contract.[3] The court repeated itself one final time and warned that if Pryor did not answer the question, "I'm going to simply retain Mr. Upshaw as your attorney." Pryor objected to being called "Mr. Pryor," and the court appointed Upshaw as counsel, to which Pryor immediately and repeatedly objected.

---

[3]Many sovereign citizens believe that by entering into a contract with the federal government, they lose their status as sovereign citizens and provide courts with jurisdiction over them. *See* Francis X. Sullivan, Comment, *The "Usurping Octopus of Jurisdictional/Authority": The Legal Theories of the Sovereign Citizen Movement*, 1999 Wis. L. Rev. 785, 802 ("Once the Sovereign Citizen contracts with the federal government, he unknowingly surrenders his personal sovereignty and agrees to be bound by the illegitimate federal law."). Indeed, a number of sovereign citizens believe that using a lawyer also constitutes acceptance of the jurisdiction of the court via contract with the government. *See, e.g.*, Charles E. Loeser, *From Paper Terrorists to Cop Killers: The Sovereign Citizen Threat*, 93 N.C. L. Rev. 1106, 1126 (2015); Taj Tarik Bey, 6-Week Civics Class: Class 4, at 2, http://rvbeypublications.com/sitebuildercontent/sitebuilderfiles/webcivicsclass4.pdf (last visited on Oct. 27, 2016) ("If one hires a Lawyer or an Attorney of the Bar Association (A.B.A.) to '*re-present*' you, then you have surrendered your *Birthrights* to that officer of the court! Jurisdiction is then assumed, and the officers of the court go straight to *Adjudicating* against you with *sanctions*, *fines*, and *jail time*, or both!").

Pryor continued to object throughout the proceeding to the court or Upshaw taking any action on his behalf. The magistrate judge announced that any further objections would result in Pryor being removed from the courtroom and added, "If you're represented by counsel, that's your doing. You have no one to blame but yourself for the situation that you're in," explaining that Pryor would not answer his questions and as such he could no longer "speak for [him]self." But when the court asked Upshaw whether he had anything to offer the court, Pryor objected again: "I am not a minor. He will not speak for me." Pryor was escorted out of the courtroom.

The next day at the initial pretrial conference, Pryor again continued his objections to Upshaw's representation of him. When told by the court that he was now represented by counsel, Pryor objected: "I have no contracts with this man. . . . I am here *in propria persona* . . . ." The magistrate judge informed Pryor that if he spoke to the court directly rather than through counsel, he would be removed from the courtroom. Despite this warning, Pryor twice objected to Upshaw's representation. On March 19, Pryor submitted an "Affidavit of truth" to the court, disclaiming the court's jurisdiction, announcing that he had no contracts with any corporation or the United States of America, and stating "Geoffrey Upshaw will not represent me." The document was rejected as not having come through appointed counsel. Pryor continued to submit affidavits asserting his desire to appear *in propria persona* and contesting the court's jurisdiction. After a further message to the court asserting his desire to proceed *in propria persona* (among other arguments), the court entered an order to automatically reject letters from Pryor and "advise[d] and recommend[ed] that Defendant Pryor consult with his counsel regarding this and all other aspects of the case." Pryor continued to send letters objecting to deprivation of his ability to be *in propria persona*, jurisdiction, and other matters.

Just over two months later at the final pretrial conference of May 20, 2015, now before Chief Judge Robert Jonker, Pryor continued his objections to Upshaw acting as his counsel, among other objections. He interrupted the court on numerous occasions to raise his objections, which were often framed in legalistic—albeit unorthodox—terms. His appointed counsel challenged the proposed voice identification by Batora and Shattuck on the basis that proper foundation could not be established and the officers were basing their identification on memory

alone, rather than on recordings that might have been made of their phone calls with Taz.  The court denied the motion.

At trial, Pryor raised objections to counsel and jurisdiction.  After a jury trial, Pryor was convicted of conspiracy to distribute 100 grams or more of heroin.  Pryor was sentenced on September 15, 2015, where he stated once again that "[t]he magistrate judge . . . appointed Geoffrey Upshaw over my objection" and made further objections to the court.  His appointed counsel objected to the quantity of drugs listed on the sentencing report, the leadership sentencing enhancement, and the firearm enhancement, as well as to the report's listing of Pryor as "black or African-American" rather than "Moors American," his name appearing as Jermaine Pryor, and a Social Security number being related to him.  The court denied the objections, finding that Pryor "ha[d] never engaged the process sufficiently to establish, assert, and enjoy the privilege of representing himself," and sentenced Pryor to 235 months in custody.

II

We begin with the threshold issue of jurisdiction.  *Hagans v. Lavine*, 415 U.S. 528, 538 (1974).  Pryor challenges the jurisdiction of this court and the court below on a number of grounds.  First, Pryor insists that he was tried for a state crime, which would deprive the federal courts of jurisdiction.  But he was charged under 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), federal statutes properly passed by Congress that provide this court with federal-question subject-matter jurisdiction.  *See* 18 U.S.C. § 3231 (2012).  Next, Pryor argues that the United States lacks standing because there is no injured party in this conspiracy case.  There is standing, however, because "the injury to [the United States'] sovereignty arising from violation of its laws . . . suffices to support a criminal lawsuit by the Government."  *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).  Pryor also contends that the court did not establish personal jurisdiction over him and attempted to preserve this argument by indicating that he was appearing specially before the district court to contest personal jurisdiction.  Federal courts have personal jurisdiction over criminal defendants before them, whether or not they are forcibly brought into court.  *See United States v. Alvarez-Machain*, 504 U.S. 655, 660–62 (1992); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952).  We have jurisdiction over this appeal through 28 U.S.C. § 1291 (2012).

On a final note, Pryor also complained that he was in an Article III court yet not before an Article III judge, which (as he did not waive the issue), if true, may constitute a violation of Article III. *See Roell v. Withrow*, 538 U.S. 580, 588–89 (2003); *United States v. Ford*, 824 F.2d 1430, 1435 (5th Cir. 1987) (en banc) ("It is sufficient here to simply observe that such a [situation] would pose grave constitutional issues."). However, the district judge who presided below, the Honorable Robert J. Jonker, is a duly appointed Article III judge, as are the members of this panel. 153 Cong. Rec. 18210 (2007); 151 Cong. Rec. 12171 (2005); 132 Cong. Rec. 3430 (1986); 131 Cong. Rec. 27728 (1985). Likewise, the district court and this court are constitutionally created Article III courts. 28 U.S.C. §§ 41, 43, 102. As a result, the case is properly before us and we may decide this matter without fear of constitutional impropriety.

III

A.  Right of Self-Representation

Although the issue has come before us on several occasions, "Sixth Circuit jurisprudence concerning the standard of review applicable to claims asserting violations of the right to self-representation is confused." *United States v. Evans*, 559 F. App'x 475, 478 (6th Cir. 2014). We have at times reviewed denials of motions for self-representation de novo, *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004), and for abuse of discretion, *Robards v. Rees*, 789 F.2d 379, 384 (6th Cir. 1986). We have also held that de novo review is required for review of a waiver of a constitutional right. *United States v. Ross*, 245 F.3d 577, 583 (6th Cir. 2001). Because we believe that under either standard of review the district court's decision was justified, we will once again defer the determination of the proper standard of review for this question.

The Sixth Amendment guarantees the right of the accused "to have the assistance of counsel for his defense." U.S. Const. amend. VI. But it also "implies a right of self-representation." *Faretta v. California*, 422 U.S. 806, 820 (1975). "To thrust counsel upon the accused, against his considered wish, . . . violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master . . . ." *Ibid.* As the right to self-representation and the right to counsel are "two faces of the same coin," the assertion of one necessarily requires the

waiver of the other. *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970) (quoting *United States v. Plattner*, 330 F.2d 271, 276 (2d Cir. 1964)). Because the "dangers and disadvantages of self-representation during trial are so substantial," a court must make a "searching or formal inquiry" before permitting a waiver of the right to counsel (although no such inquiry is required for the correlative waiver of right to self-representation[4]). *Hill v. Curtin*, 792 F.3d 670, 677 (6th Cir. 2015) (en banc) (citation omitted). The object of the inquiry is to establish that the defendant "knowingly, intelligently, and voluntarily" waived the right and "his choice is made with eyes open." *Fowler v. Collins*, 253 F.3d 244, 249 (6th Cir. 2001) (quoting *Faretta*, 422 U.S. at 835). "[N]o degree of legal knowledge is required" to assert the right, so long as the defendant appreciates what he is forgoing. *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987).

In the Sixth Circuit, we have mandated a formal inquiry, using our supervisory powers, that federal district judges must undertake to determine whether a waiver is proper. *Id.* at 249–50. Where a request to self-represent is clear, unequivocal, and timely, the court "must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004); *see also Cromer*, 389 F.3d at 682.

After Pryor was adjudged competent, the magistrate judge attempted to inform him of his rights. To almost every question, however, Pryor responded with a question of his own, mostly addressed at the court's jurisdiction. When the magistrate judge asked directly whether Pryor wished to represent himself or have counsel represent him, the closest Pryor came to acknowledging that he wished to represent himself was his statement "I will be myself." This statement can hardly be called a clear assertion of the right to self-representation, especially given Pryor's failure to confirm that meaning of his statement upon repeated inquiries by the judge. We have found, where a defendant "repeatedly interrupted the judge, complained, and answered almost every question by contending that he did not understand," a district court's

---

[4]Some courts have justified the lack of inquiry by asserting that the right to counsel "attaches automatically and must be waived affirmatively to be lost, while the [right to self-representation] does 'not attach unless and until it [i]s *asserted*.'" *Stano v. Dugger*, 921 F.2d 1125, 1143 (11th Cir. 1991) (en banc) (second alteration in original) (quoting *Dorman v. Wainwright*, 798 F.2d 1358, 1366 (11th Cir. 1986)); *see also Brown v. Wainwright*, 665 F.2d 607, 610 (Former 5th Cir. 1982) (en banc).

denial of a motion for self-representation would not be reversed under an abuse-of-discretion standard. *United States v. Carradine*, 621 F.3d 575, 579 (6th Cir. 2010), *abrogated on other grounds by Dorsey v. United States*, 132 S. Ct. 2321 (2012). Pryor's refusal to provide a straight answer to the thrice-repeated question of whether he wished to be represented by counsel or by himself was a rejection of further inquiry into his waiver of counsel and justified the magistrate judge's conclusion of the colloquy. A court facing such resistance can hardly be expected to proceed through the questions in anticipation that the defendant may change his mind and begin responding. *See, e.g.*, *Carradine*, 621 F.3d at 579.

This result is fully consistent with *Faretta* and similar cases. *Faretta* itself noted that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom . . . [nor] a license not to comply with relevant rules of procedural and substantive law." 422 U.S. at 834 n.46. The *Faretta* Court used *Illinois v. Allen* to explain this restriction on the right of self-representation. *Allen* had held that an "obstreperous defendant" could be removed from the courtroom "until he promises to conduct himself properly." *Illinois v. Allen*, 397 U.S. 337, 343–44 (1970); *see also Faretta*, 422 U.S. at 834 n.46. If a defendant may be removed from a courtroom for his disorderly behavior and waive his right to be present at trial, so too can he waive his right to act pro se and thus have appointed counsel act in his stead while he is removed from the courtroom. *See Faretta*, 422 U.S. at 834 n.46; *United States v. Dougherty*, 473 F.2d 1113, 1125 (D.C. Cir. 1972). The refusal to provide answers to the colloquy is similar to a refusal to attend proceedings, and the court may treat it as a waiver of the right to self-representation. But this court has held that "no action against an unruly defendant is permissible except after he has been fully and fairly informed that his conduct is wrong and intolerable, and warned of the possible consequences of continued misbehavior." *Gray v. Moore*, 520 F.3d 616, 623 (6th Cir. 2008) (quoting *Allen*, 397 U.S. at 350 (Brennan, J., concurring)).

Here, the magistrate judge, after his attempts to have Pryor expressly state he wished to represent himself, clearly warned Pryor that failure to respond to the question would result in the appointment of Upshaw as his attorney. Pryor's answer was nonresponsive, and so the magistrate judge permissibly appointed counsel and ended the colloquy. *See Carradine*, 621 F.3d at 579; *cf. United States v. Knight*, 896 F.2d 1369, 1990 WL 18055, at *5 (6th Cir.

1990) (unpublished table decision) (per curiam) ("The transcript demonstrates that quizzing [the defendant] as *McDowell* directs would have been futile."); *Raulerson v. Wainwright*, 732 F.2d 803, 809 (11th Cir. 1984) (holding the right to self-representation waived where the defendant left the courtroom in the middle of the *Faretta* inquiry).

This finding is not the end of Pryor's claim, however, as defendants may assert the right to self-representation later in proceedings, where the assertion is timely and not an attempt to delay or manipulate proceedings. *See, e.g., Moore v. Haviland*, 531 F.3d 393 (6th Cir. 2008) (holding that the court was required to perform a *Faretta* inquiry even after the defendant had begun trial with counsel); *Robards*, 789 F.2d at 383. This case presents the question of whether a defendant who has waived his right through a refusal to engage with court proceedings and procedure can reinvoke his right without a demonstration or promise that the conduct that caused the initial waiver will not reoccur. Because we find that a defendant who has thus waived his right must make some indication that he will engage with the court at least to the extent of answering procedural questions such as the colloquy and that Pryor made no such indication, we need not decide whether Pryor's scores of objections to counsel's actions and claims that he was appearing "*in propria persona*"[5] suffice to constitute a clear and unequivocal invocation of the right to self-representation. *See Cromer*, 389 F.3d at 682; *United States v. Pittman*, 816 F.3d 419, 426 (6th Cir. 2016) (finding that where a defendant rejects counsel, it may be the same as a choice to self-represent).

Having waived his self-representation right previously by reason of his nonanswers, Pryor needed to make a good-faith showing that the problem would not reoccur. In *Allen*, the defendant agreed to behave and was permitted to return (and was in fact thrown out for disruption and then readmitted once again later when he made a new promise). *See* 397 U.S. at 340–41. Absent that promise, the court had no reason to expect that Pryor would change his mind and answer the questions rather than treat the colloquy as another "offer to contract" and reject the inquiry anew. Having set the status quo himself, Pryor bore the light burden of showing that his behavior had changed and he would proceed with the *Faretta* inquiry.

---

[5]"*In propria persona*" is legally equivalent to "pro se" and was treated as such in *Faretta*. *See Faretta*, 422 U.S. at 816, 839; *In propria persona, Black's Law Dictionary* (10th ed. 2014) ("See pro se.").

Courts dealing with defendants seeking to represent themselves face a dilemma: the potential for an unconstitutional denial of the right to counsel if the right to self-representation is too quickly provided or reversal for unconstitutional denial of the right to self-representation if the right to counsel is too vigorously shielded.  The method that our court has devised to avoid the predicament is to provide an opportunity for defendants to indicate their desire to waive the right to counsel and then to undertake a thorough review of the detriments and disadvantages that accompany such a waiver.  Where the defendant through his own actions does not permit the court to ascertain whether a waiver is knowing or voluntary, or even if he means to waive at all, he cannot use the court's failure to acknowledge the waiver later to take a mulligan and try his case again if he loses.  This is not to say that an obstreperous defendant has forever waived his right to self-representation; on the contrary, where "he promises to conduct himself properly," the court should reinvestigate the invocation.  *Allen*, 397 U.S. at 344.  Pryor, however, made no such promise and instead simply continued to make objections and interrupt the court.  Accordingly, the district court had no indication that he would comply with and complete the colloquy this round, and Pryor's right to self-representation remained waived.

## B.  Admission of Voice-Identification Testimony

Pryor also argues that the admission of the voice-identification testimony of Deputy Shattuck and Officer Batora was in error.  We review the district court's admission of evidence for abuse of discretion.  *See United States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004).  "The standard for the admissibility of an opinion as to the identity of a speaker is merely that the identifier has heard the voice of the alleged speaker at any time." *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir. 1986) (quoting *United States v. Rizzo*, 492 F.2d 443, 448 (2d Cir. 1974)).

It is clear that the district court did not abuse its discretion.  First, although Shattuck's initial conversations with "Taz" were without prior knowledge of Pryor's voice, his listening to the phone calls and watching the video recording made while Pryor was incarcerated provided him with a reliable exemplar.  Defense counsel admitted that the recordings were of Pryor, acknowledging "we don't dispute that the voice on the jailhouse recording is the voice of the defendant."  The order of listening to voices (the voice to be compared and the exemplar) is not

dispositive of the admissibility of the testimony, as Federal Rule of Evidence 901(b)(5) permits testimony based on "hearing the voice *at any time.*"  Fed. R. Evid. 901(b)(5) (emphasis added); *see also United States v. Simms*, 351 F. App'x 64, 69 (6th Cir. 2009).  Additionally, because Shattuck was able to compare the telephone calls with the video recording, he could confirm that those calls were made by the man in the video recording.  Even Pryor's argument that Shattuck could not confirm the accuracy of Detective Delaney's assertion that the jail calls were from Pryor is unavailing; Shattuck identified Pryor in court, essentially making the connection between Pryor, the phone calls, and video.  There is no requirement that the exemplar be from a face-to-face conversation.  *See, e.g.*, *United States v. Mendiola*, 707 F.3d 735, 741 (7th Cir. 2013).  Nor must the witness be qualified as an expert.  *See, e.g.*, *United States v. Recendiz*, 557 F.3d 511, 527 (7th Cir. 2009); *cf. United States v. Harris*, 786 F.3d 443 (6th Cir. 2015) (finding lay testimony permissible for handwriting comparison).  Batora's conversations were made after listening to the twenty-minute recording.  Again, because defense counsel admitted that the recording was of Pryor, the recordings were a proper exemplar.  Thus, Batora could compare the voice in the recording with his personal recollection of the voice on the phone calls that he made later to set up drug buys.

Pryor also argues that the conversations that Shattuck and Batora had with Taz were too brief to establish familiarity with the voice.  We found in *United States v. Cooper*, 868 F.2d 1505 (6th Cir. 1989), that the district court's admission of testimony by an officer who had listened to tape recordings of a conversation with a voice to be identified and spoken with a defendant for thirty seconds was not an abuse of discretion.  *Id.* at 1519.  There is no reason why it should matter whether the exemplar or the voice to be compared is of short duration; thus, relying on the multiple minute-long conversations that Shattuck and Batora had with Taz to admit the testimony is not an abuse of discretion.

Finally, Pryor contends that the failure of the police to record the phone calls negotiating the purchase of heroin should preclude the testimony.  Although such recordings would be helpful to a court and jury, they are not required.  *See Simms*, 351 F. App'x at 69 (permitting testimony identifying a voice on a recording where witness had last heard unrecorded exemplar

two years previously).  In sum, the court did not abuse its discretion in permitting the voice-identification testimony.

C.  Sentencing Enhancement for Possession of a Firearm in Furtherance of a Drug Crime

Pryor's Guidelines sentencing range was enhanced by application of USSG §2D1.1(b)(1), which provides that where a defendant is convicted of a conspiracy to traffic under 21 U.S.C. § 841, "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." USSG §2D1.1(b)(1).  "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  *Id.* §2D1.1 comment. n.3(A).  Pryor argues that there was insufficient evidence to demonstrate that he possessed a firearm in connection with his drug-trafficking offense.  We review a district court's interpretations of the Sentencing Guidelines de novo and factual findings at sentencing for clear error.  *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012).  "A district court's finding that a defendant possessed a firearm during a drug crime is a factual finding subject to the clearly erroneous standard of review."  *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010) (quoting *United States v. Darwich*, 337 F.3d 645, 664 (6th Cir. 2003)).

The application of §2D1.1(b)(1) involves a two-part test.  First, the government has the burden of demonstrating "by a preponderance of the evidence that '(1) the defendant actually or constructively "possessed" the weapon, and (2) such possession was during the commission of the offense.'"  *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)).  Once that burden is met, the enhancement applies unless the defendant can present evidence to show that it was "'clearly improbable' that the weapon was connected to the offense."  *Greeno*, 679 F.3d at 514 (quoting *Catalan*, 499 F.3d at 606).

It is clear that Pryor possessed a firearm during the conspiracy to traffic in heroin.  He was pulled over after leaving a house where heroin had been sold, having collected the proceeds of a drug transaction.  There is no need for the government to demonstrate the connection between the firearm and the crime to shift the burden.  *See United States v. Dixon*, 262 F. App'x 706, 711 (6th Cir. 2008); *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991) ("The

government does not have to produce any further evidence establishing a *connection* between the weapon and the offense for § 2D1.1(b)(1) enhancement to be appropriate."), *abrogated on other grounds by United States v. Jackson-Randolph*, 282 F.3d 369 (6th Cir. 2002). In *Dixon*, the firearm was in a car that the defendant drove to the meeting place and left in an adjacent lot before walking to a building to perform a drug purchase. Those circumstances were sufficient to shift the burden to the defendant. Much like in *United States v. Moses*, 289 F.3d 847 (6th Cir. 2002), Pryor "kept [a] firearm[] in his [car] during the period of the conspiracy . . . [and] used his [car] to perform acts in furtherance of the conspiracy; namely," to collect drug proceeds. *Id.* at 850. The government has met its burden.

Once the burden shifts to the defendant, he must demonstrate that it was "clearly improbable" that the weapon was connected to the offense. In examining the probability of a connection, the court weighs a number of factors, including:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*Greeno*, 679 F.3d at 515 (citations omitted). Here, the weapon was a Glock pistol, not an antique musket or hunting rifle that might be impractical in connection with drug trafficking. The weapon was concealed on the defendant and was loaded. Pryor was arrested with the proceeds on him in the car while departing from the location of a drug transaction. While it is possible that Pryor happened to be carrying his legally licensed firearm with him without any connection to the conspiracy, it is just as likely (if not far more so) that he brought the gun to protect himself and his trade. *Cf. United States v. Penaloza*, 648 F. App'x 508, 519 (6th Cir. 2016); *United States v. Shults*, 68 F. App'x 648, 654 (6th Cir. 2003). This possibility is insufficient to show that the connection to the offense was clearly improbable.

Because Pryor cannot demonstrate that the district court committed clear error in applying the sentencing enhancement, we affirm the district court's sentence.

IV

There is something peculiar in the fact that the only reason that Jermaine Pryor is able to raise his right to self-representation claims is because his appointed counsel is raising it for him; otherwise, Pryor would insist only on his jurisdictional defense. Here, however, neither argument is compelling. The Constitution provides defendants the choice to either use the assistance of counsel or go it alone. While we must be vigilant against removing that right to the choice, Pryor himself refused to make the choice or engage the court. Where a court has tried and failed to perform a colloquy due directly to the defendant's failure to cooperate and that defendant has not made an indication that he will cooperate in the future, the court may deem the right waived. The district court was justified in denying the request to proceed pro se, the voice testimony was properly admitted, and the sentencing enhancement was properly applied. For these reasons, we **AFFIRM** the judgment of the district court.