<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 19a0402n.06

**Nos. 18-5907/5908**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 02, 2019
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>IMANOL PINEDA PENALOZA; EFRAIN<br>VILLA VILLANUEVA,<br><br>    Defendants-Appellees.<br><br>_____/ | ON APPEAL FROM THE UNITED<br>STATES DISTRICT COURT FOR THE<br>EASTERN DISTRICT OF KENTUCKY |

BEFORE:  SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

**CLAY, Circuit Judge.**  Defendant Imanol Penaloza appeals his sentence of 340 months of imprisonment for conspiracy to distribute five kilograms or more of cocaine and possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), and 846. Specifically, Penaloza challenges the district court's: (1) calculation of his base offense level, (2) application of a two-level firearm enhancement, and (3) application of a four-level leadership enhancement. Defendant Efrain Villanueva appeals his conviction for conspiracy to distribute five kilograms or more of cocaine in violation of 21 U.S.C. § 841(a)(1), and 846. For the following reasons, we **AFFIRM** Penaloza's sentence, and **AFFIRM** Villanueva's conviction.

## BACKGROUND

### I. Procedural Facts

On March 1, 2018, defendants Imanol Penaloza ("Penaloza") and Efrain Villanueva ("Villanueva"), along with Sergio Aguilar Piedra ("Piedra"), were indicted by a federal grand jury for "conspir[ing] together and with others to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance," in violation of 21 U.S.C. §§ 841(a)(1), and 846. (R. 1 at PageID #1.) Additionally, the grand jury indicted Penaloza, along with Piedra, for "possess[ion] with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance," in violation of 21 U.S.C § 841(a)(1). (R. 1 at PageID #2.) Villanueva moved to sever his case from Piedra's case, and the district court denied that motion. (R. 31 at PageID #74–75.)

Piedra pleaded guilty, (5:18-cr-00030-DCR-2, Doc. 40), so the district court held a joint trial for Penaloza and Villanueva. (R. 60; R.61; R. 62.) At the close of the government's case, Villanueva's attorney moved for a judgment of acquittal; however, he did not renew that motion after presenting his evidence. (R. 62 at PageID #717, 54:16–18; R. 62 at PageID #727, 64:9–13; R. 62 PageID #734, 71:17–19.) On May 23, 2018, a jury found Penaloza guilty of conspiracy to distribute five or more kilograms of cocaine, and of possession with intent to distribute 500 grams or more of cocaine. (R. 62 at PageID #786, 123:9–16, 123:25–124:7.) During the sentencing phase, the presentence report calculated a base offense level of thirty-four for Penaloza. (R. 86 at PageID #927; R. 101 at PageID #1054, 24:1–13.) Penaloza objected to the presentence report's recommended sentence enhancements, and after hearing arguments by both parties, the district court overruled Penaloza's objections. (R. 101 at PageID #1053, 23:23–25.) The district court

imposed on Penaloza a two-level firearm enhancement, and a four-level leadership enhancement for his role in the conspiracy. The district court sentenced Penaloza to 340 months of incarceration. The jury found Villanueva guilty of conspiracy to distribute five kilograms or more of cocaine. The district court sentenced Villanueva to 200 months of incarceration. Penaloza and Villanueva filed timely notices of appeal to this Court.

## II. Relevant Testimony Presented at Trial

### *Matt Evans*

Narcotics detective Matt Evans ("Detective Evans") testified that the investigation involving Penaloza and Villanueva began in 2015 as a part of the investigation of Serafin Villa Gomez ("Gomez"). At the time, Detective Evans received information that Gomez was operating a large-scale cocaine trafficking operation at a residence located on Lonan Court ("Lonan Court"), in Lexington, Kentucky. Detective Evans witnessed Villanueva arrive and depart from Lonan Court during the course of the investigation.

Detective Evans obtained a search warrant for Lonan Court, and once executed, Penaloza, among others, was present at the residence, sitting in the living room. During the search of the residence, officers discovered and seized approximately five kilograms of cocaine from a cooler in the garage, $100,100 in U.S. currency from a different cooler in the garage, $179,000 in U.S. currency from a backpack in a bedroom closet, $96,000 in U.S. currency in another bag located in the same closet, one firearm in each of the two bedrooms, for a total of two firearms, fifteen kilograms of cocaine in a hidden compartment inside of the vehicle parked in the garage, and a plethora of bulk packaging and processing materials.[1] Analysts discovered Penaloza's fingerprints

---

[1] Detective Evans inconsistently testified that the backpack contained either $179,000 or $197,000. The government uses the $179,000 figure while Penaloza uses the higher $197,000 amount. This slight difference does not affect our analysis of Penaloza's attributable drug quantity.

on the packaging that stored the $179,000 of U.S. currency. During the search, officers also found Villanueva's Mexican consular identification card and his passport.

*Troey Stout*

Agent Troey Stout ("Agent Stout") testified about his involvement as the lead investigator of Ciro Macias Martinez ("Martinez"). Agent Stout testified that Martinez was one of the leaders of a major drug trafficking organization that had direct ties to Mexico, and that Martinez facilitated large bulk shipments of cocaine and other drugs in the central Kentucky region, including Lexington and Louisville. He described a complex scheme that involved Martinez collecting drug proceeds and directing his wife, Brizeida Janett Sosa ("Sosa"), to launder the money using various methods. Agent Stout testified that through his investigation of Martinez, he became aware of Penaloza and Villanueva. Penaloza is Villanueva's uncle.

Agent Stout testified that Penaloza had a leadership role in the drug organization. *See* R. 61 at PageID #523, 65:3–5 ("Well, the significance of that too, I wanted to point this out, is that Mr. Penaloza is acting as a leader in this role here. He gets the call and agrees to it, and he sends somebody else to do it on his behalf."); *see also* R. 61 at PageID #523, 65:1–5 ("Mr. Penaloza says, 'Right now, right now. I'll tell the dude to wait for you over there at the house.' It's clear who's in charge. It's clear that he's the leadership role. He's directing this." He testified that Penaloza was intercepted via wiretap on multiple occasions, one in which he arranged for Martinez to pick up drug proceeds, and that Villanueva was not intercepted via wiretap. Agent Stout identified four locations in Kentucky subject to his investigation that involved Penaloza and Villanueva – The Los Tres Hermanos Tire Shop on Seventh Street in Louisville ("Tire Shop"), a residence off of 39th Street in Louisville, a residence on Hazel Street in Louisville, and a residence on Lonan Court in Lexington.

4

Agent Stout described surveillance video of Martinez waiting outside of the 39th Street residence until Villanueva arrived to let him into the house. Agent Stout also described video of two separate drug transactions where he subsequently directed local officers to pull over certain vehicles involved after the transactions were complete. Villanueva was present in the related vehicle and identified himself to officers on both occasions.

*Brian Reccius*

Officer Brian Reccius investigated the Tres Hermanos Tire Shop and conducted between five and ten controlled purchases of drugs out of that location by utilizing informants. Officer Reccius identified Penaloza and Villanueva during the course of the investigation of the Tire Shop, and witnessed Penaloza and Villanueva at the Tire Shop on multiple occasions. Officer Reccius testified that the investigation revealed that Penaloza was likely a boss in this drug trafficking ring and that Villanueva likely performed tasks related to pickup and delivery of drugs and money.

*Brizeida Janett Sosa*

Brizeida Sosa ("Sosa") is married to Martinez. During Martinez's involvement in trafficking drugs, Sosa's role was to assist in laundering the money, which amounted to approximately $2 million. Sosa witnessed Martinez deliver five to seven kilograms of cocaine to Penaloza and Villanueva at the tire shop or a private residence on less than ten but more than five separate occasions. Sosa also testified to Villanueva's presence at a drug deal that took place behind a bus station.

*Christopher Hill*

Special Agent Christopher Hill ("Special Agent Hill") witnessed and recorded Villanueva's arrival at the residence on 39th Street and Villanueva's opening of the front door to

the residence for Martinez. Special Agent Hill witnessed Villanueva in conjunction with the drug trafficking investigation on at least three other occasions.

## DISCUSSION

### I.   Imanol Penaloza

Penaloza argues that the district court erred in determining the drug quantity attributable to himself, and that the court erred in applying both of his sentence enhancements. He also argues that a jury, not the sentencing judge, should have decided facts relevant to his sentencing. We address each in turn.

#### A.  Sentencing Determination of Drug Quantity

##### 1.   Standard of review

"We review for clear error the district court's factual findings on drug quantity attributable to a defendant for sentencing purposes." *United States v. Rios*, 830 F.3d 403, 436 (6th Cir. 2016) (quoting *United States v. Darwich*, 337 F.3d 645, 663 (6th Cir. 2003)). Under section 2D 1.1(c) of the United States Sentencing Commission, Guidelines Manual ("Sentencing Guidelines"), the district court must determine the quantity of drugs for which a defendant is responsible in order to determine his or her base offense level. In determining the base offense level, sentencing courts must consider quantities of drugs "that were part of the same course of conduct or common scheme or plan as the offense of conviction." USSG § 1B1.3(a)(2). When the quantity of drugs attributed to a particular defendant is not precise, as is the case in this instance, the district court must "err on the side of caution and may only hold a defendant accountable for a specific quantity for which he is more likely than not actually responsible." *Rios*, 830 F.3d at 436 (quoting *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013)).

2. Analysis

Penaloza argues there is insufficient evidence in the record to prove that he is responsible for any more than twenty kilograms of cocaine. Accordingly, he argues that his base offense level should not have been calculated at thirty-four, but instead thirty-two. He asserts that "[t]he Court speculated, estimated and made assumptions that were at best not supported by the evidence and at worse simply erroneous." (Penaloza Br. at 23.) Upon review of the record, the district court did not clearly err in estimating the drug quantity attributable to Penaloza.

At the sentencing hearing, Penaloza objected to the drug quantity utilized to calculate his base offense level contained in his presentence report. Under the Sentencing Guidelines, the court "shall resolve disputed sentencing factors at a sentencing hearing in accordance with [Federal Rules of Criminal Procedure 32(i)]." USSG § 6A1.3(b). Fed. R. Crim. P. 32(i)(3)(B) requires the sentencing court to rule on all disputed portions of the presentence report, or to determine that a ruling is unnecessary. Fed. R. Crim. P. 32(i)(3)(A) gives the court the option to "accept any undisputed portion of the presentence report as a finding of fact." Section 6A1.3(a) of the Sentencing Guidelines allows a sentencing court to "consider[] relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." *See also United States v. Stout*, 599 F.3d 549, 558 (6th Cir. 2010).

In this instance, the district court heard oral argument and overruled each of Penaloza's three objections to portions of the presentence report. After overruling Penaloza's objections, the district court adopted the findings contained in the presentence report. The presentence report thoroughly describes Penaloza's involvement in an international drug trafficking ring, and the

report's factual findings are supported by the evidence produced at trial. As such, the presentence report's findings exceed the minimum-indicia-of-reliability standard. *See Stout*, 599 F.3d at 558.

In overruling Penaloza's objection to the amount of cocaine attributed to Penaloza, the district court found that a cocaine quantity in excess of fifty kilograms was "very, very clear." (R. 101 at PageID #1048, 18:9–12.) For this finding, the court relied upon the testimony of law enforcement who conducted the search of the residence on Lonan Court, where Penaloza was present at the time of search. Law enforcement officers and agents testified to the seizure of nearly $400,000 in U.S. currency and approximately nineteen kilograms of cocaine. This testimony supported the presentence report's estimate that the search of the Lonan Court residence produced an equivalent of approximately thirty-two kilograms of cocaine that is attributable to Penaloza. Penaloza does not dispute the amount attributable to him from the Lonan Court residence.

The district court also relied upon the testimony of Brizeida Sosa, who witnessed her husband Martinez deliver five to seven kilograms of cocaine to Penaloza on less than ten but more than five separate occasions. Sosa traveled to and from most drug transactions with her husband, and was actively involved in the laundering of the beaucoup money received from those transactions. From the drug quantity ranges Sosa provided at trial, the district court estimated approximately seven to eight deliveries with an average of eight kilograms of cocaine per delivery, for a total of fifty-six to sixty-four kilograms of additional drug quantity.

We do not find the district court's estimation to be a clear error. Sosa's testimony regarding Penaloza's involvement with drug deliveries from Martinez is not only undisputed, but also meets the minimum-indicia-of-reliability standard. *See* R. 62 at PageID #762, 98:12–18 (during closing argument at trial, Penaloza's attorney stated, "And interestingly enough the very last witness that the government put on the stand, Ms. Sosa, and she was being very sincere with you. I take no –

no problem with what she had to say here today.") Penaloza summarily challenges the drug quantity attributed to him, but does not identify how the district court's findings are inconsistent with the evidence at trial. Even if the district court would have taken the lowest number of each range—five deliveries of five kilograms of cocaine—for a total of twenty-five additional kilograms of cocaine, once added to the undisputed thirty-two kilograms from Lonan Court, the court would have found Penaloza responsible for more than 50 kilograms of cocaine which equates to a base offense level of thirty-four. USSG § 2D1.1(c)(3). Therefore, there was no clear error in the district court's finding that Penaloza can be held responsible for fifty to 150 kilograms of cocaine.

    B.  Sentencing Enhancement for Possession of a Dangerous Weapon

        1.  Standard of review

This Circuit reviews a district court's factual findings regarding the application of the firearms enhancement for clear error. *United States v. Benson*, 591 F.3d 491, 504 (6th Cir. 2010). The Sentencing Guidelines allow for a two-level base offense level increase "[i]f a dangerous weapon (including a firearm) was possessed." *See* USSG § 2D1.1(b)(1). If the government is successful in proving by a preponderance of the evidence that "(1) the defendant actually or constructively 'possessed' the weapon, and (2) such possession was during the commission of the offense," this Court shifts the burden onto the defendant for him or her to prove "that it was 'clearly improbable' that the weapon [at issue] was connected to the offense." *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007) (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)).

2. Analysis

Penaloza argues that there is insufficient evidence of a link between any firearms seized during the investigation and Penaloza's involvement in the conspiracy. At sentencing, Penaloza argued against the enhancement on the basis that the firearm was well-hidden and unknown to visitors to the home, including Penaloza. He does not develop this argument any further on appeal.

The district court did not err when it applied the two-level sentence enhancement to Penaloza's sentence. The district court held that Penaloza constructively possessed a firearm to further the conspiracy to distribute cocaine in Kentucky. This Court has held that "possession of a gun by one coconspirator is attributable to another coconspirator if such possession constitutes reasonably foreseeable conduct." *Catalan*, 499 F.3d at 607 (quoting *United States v. Cochran*, 14 F.3d 1128, 1132 (6th Cir. 1994)); *see also* USSG § 1B1.3(a)(1)(B)(iii) (finding relevant conduct in the conspiracy context conduct that is "reasonably foreseeable in connection with that criminal activity").

To support the constructive possession holding, the district court relied upon the fact that two guns and ammunition were found at the Lonan Court residence, Penaloza's brother-in-law's home, and that the residence was used for drug-trafficking activities. The court stated:

> This was a drug distribution facility for receipt, packaging, repackaging of large quantities of drugs, and it would be foreseeable to all those present on a regular basis, and this defendant was, that firearms would be present to protect large quantities of drugs, as well as cash, and that would be typical for this type of … drug trafficking activity, and the firearms were of the nature, were the type of firearms that are typically found in these locations where large quantities of drugs are being processed and distributed. So I do find that the firearm was possessed, at least by another co-conspirator, and it is reasonably foreseeable to this defendant that the firearm, or firearms, were present.

(R. 101 at PageID #1052, 22:9–22.) We disagree with Penaloza's assertion that "[t]he court made no findings that support that [Penaloza] either actually or constructively possessed the firearm." (Penaloza Br. at 26.) Based on the aforementioned rationale supported by evidence presented at

10

trial, the district court did not err in holding that the government met its burden in proving Penaloza constructively possessed the firearms in relation to the conspiracy to distribute cocaine in Kentucky.

Although Penaloza argued at sentencing that one of the firearms was hidden and Penaloza was unaware of the gun's presence in the home, that is not the standard upon which this Court applies. "Once the burden shifts to the defendant, he must demonstrate that it was 'clearly improbable' that the weapon was connected to the offense." *United States v. Pryor*, 842 F.3d 441, 453 (6th Cir. 2016). To determine the probability of a connection, this Court weighs the following factors:

> (1) the type of firearm involved; (2) the accessibility of the weapon to the defendant; (3) the presence of ammunition; (4) the proximity of the weapon to illicit drugs, proceeds, or paraphernalia; (5) the defendant's evidence concerning the use of the weapon; and (6) whether the defendant was actually engaged in drug-trafficking, rather than mere manufacturing or possession.

*Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 515 (6th Cir. 2012)).

In Penaloza's case, the weapons recovered were a loaded Glock pistol and an unloaded Phoenix Arms pistol (found near ammunition). In one bedroom, investigators found the Glock pistol in close proximity to over $260,000 of U.S. currency. In a second bedroom, investigators found the Phoenix Arms pistol in close proximity to ammunition, over $12,000 of U.S. currency, and approximately 217 grams of cocaine. Investigators testified at trial that Penaloza was directly involved in facilitating drug-trafficking activities in the conspiracy. Importantly, Penaloza did not provide any evidence demonstrating that it was clearly improbable that the firearms were connected to his drug offense and, thus, did not meet his burden. Accordingly, the district court's application of the Section 2D1.1(b)(1) dangerous weapon enhancement to Penaloza's sentence was not clearly erroneous.

C. Sentencing Enhancement for Leadership Position

    1. Standard of review

This Court reviews the legal conclusion that a person is an organizer or leader under Section 3B1.1 deferentially, not *de novo*. *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (conclusively addressing previously unresolved standard of review regarding a district court's decision to apply the Section 3B1.1 sentencing enhancement).

    2. Analysis

Penaloza appeals the district court's application of a four-level base offense level enhancement under USSG § 3B1.1 for his role in the conspiracy. Penaloza acknowledges the jury's guilty verdict; however, he disputes the district court's finding that he was a leader, claiming that he was "at best, a participant." (Penaloza Br. at 27.)

The district court has the authority to increase a defendant's base offense level by four levels "if the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). The Sentencing Guidelines commentary provide additional guidance for courts evaluating whether a defendant qualifies as a leader:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

USSG § 3B1.1, cmt. n. 4.

We defer to the district court's holding that Penaloza was a leader in this conspiracy that involved at least five participants. The court found that Penaloza was responsible for relocating the drug trafficking operation once the Lonan Court residence was raided and shut down as a base

for the conspiracy. Penaloza relocated the operation to Louisville, and did so using the help of other individuals named in the conspiracy. The court held that these facts supported a leadership enhancement.

Additionally, Agent Stout testified that Penaloza was a leader. The district court reviewed the transcripts of the wiretaps of individuals in the conspiracy that were entered into evidence at trial. The court found that after Penaloza received instructions from individuals in Mexico, the requested tasks were completed. The district court addressed the number of individuals in the conspiracy and named five participants. After applying the relevant Sentencing Guidelines factors and evidence presented at trial, the district court held that Penaloza was a leader of the conspiracy who directed the activities of participants, and accordingly applied the leadership enhancement. Finding the district court's analysis a sufficient application of the facts, we defer to its holding and affirm the enhancement.

### D. Jury v. Judicial Determinations of Facts Underlying Sentence

Penaloza argues that the district court erred when it evaluated facts that led to the enhancement of his base offense level, and thus his overall sentence. He debates the appropriate standard of proof and asserts that the jury, not the district court judge, should have decided the exact quantity of drugs attributed to him, whether he constructively possessed a firearm, and whether he was a leader in the conspiracy. However, Penaloza does not dispute either of his guilty verdicts. Count 1 for which he was found guilty (Conspiracy to Distribute Five Kilograms or More of Cocaine) has a statutory sentencing range of ten years to life imprisonment. *See* 21 U.S.C. § 841(b)(1)(A). Count II (Possession with the Intent to Distribute 500 Grams or More of Cocaine) has a statutory sentencing range of five to forty years. *See* 21 U.S.C. § 841(b)(1)(B). It is well-settled by the Supreme Court that "[o]ther than the fact of a prior conviction, any fact that increases

the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also Alleyne v. United States*, 570 U.S. 99, 107–08 (2013).

Under the circumstances of Penaloza's case, the district court properly decided whether Penaloza was subject to the aforementioned base offense level sentencing enhancements, including the drug quantity attributed to Penaloza. The district court sentenced Penaloza to 340 months of imprisonment, which is within Penaloza's statutory range for both counts. No fact related to those enhancements increased Penaloza's penalty beyond the prescribed statutory maximum sentences of forty years or life imprisonment. Thus, the facts were not required to be decided by a jury.

## II.    Efrain Villanueva

Villanueva argues that there is insufficient evidence to support his conviction, and that the district court erred by not providing the jury with a multiple conspiracy instruction. We address each in turn.

### A.  Sufficiency of the Evidence

#### 1.  Standard of review

"[W]hen the sufficiency of the evidence is challenged on appeal, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[.]" *United States v. Damra*, 621 F.3d 474, 494 (6th Cir. 2010) (quoting *United States v. Kuehne*, 547 F.3d 667, 696 (6th Cir. 2008)). However, in this instance we review Villanueva's sufficiency challenge under the "manifest miscarriage of justice" standard because Villanueva forfeited the challenge when he failed to renew his Fed. R. Crim. P. 29(a) motion at the close of his presentation of evidence. *Kuehne*, 547 F.3d at 697; *see also* Villanueva Br. at 12 (conceding application of this standard). Under the

"manifest miscarriage of justice" standard, this Court only reverses a conviction "if the record is devoid of evidence pointing to guilt." *Id.* (quoting *United States v. Carnes*, 309 F.3d 950, 956 (6th Cir. 2002)).

2. Analysis

Villanueva insists that there is no evidence that links him to the conspiracy other than his physical proximity to his uncle (Penaloza) and parents (owners of Lonan Court residence) who happened to be involved. The jury interpreted the government's evidence against him differently, and we do not disturb the jury's credibility determinations on appeal. *United States v. Phibbs*, 999 F.2d. 1053, 1064 (6th Cir. 1993). The question here is whether the jury could find a legally sufficient connection between Villanueva and the conspiracy. *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) ("To sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved: (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy.").

There are many instances in which the jury could have determined that Villanueva was a knowing participant to the conspiracy. The jury was within their authority to rely upon circumstantial evidence to convict a defendant of conspiracy, so there need not be a smoking gun in the form of an express agreement. *Id.* ("The existence of a conspiracy may be inferred from circumstantial evidence that can be reasonably interpreted as participation in the common plan.") (internal citations omitted). At trial, the jury heard from Detective Evans who witnessed Villanueva come and go from the Lonan Court residence, where Villanueva's consular identification card and passport were found. As a part of the investigation of the conspiracy, Agent Stout directed local officers to pull over certain vehicles leaving the drug transactions being surveilled, and on two occasions Villanueva was either the driver or passenger of the vehicle.

Officer Reccius testified that he witnessed Villanueva at the Tire Shop on multiple occasions throughout the investigation, and believed Villanueva performed tasks related to receipt and delivery of drugs and drug money. Brizeida Sosa testified that she witnessed her husband, Martinez, deliver drugs to Villanueva at the Tire Shop on multiple occasions. Sosa also testified that she saw Villanueva at a drug deal that took place behind a bus station. The jury also heard testimony from Special Agent Hill, who recorded Villanueva letting Martinez into the 39th Street residence. Special Agent Hill witnessed an unknown male arrive at the Tire Shop in a white truck, unload what looked like iPhones, and hand one of the phones to Villanueva.

We find that Villanueva has not overcome the high burden of proving that the record is devoid of evidence pointing to his guilt. *See Kuehne*, 547 F.3d at 697. The jury could have based its decision on any number of facts in the record evidencing Villanueva's involvement in the conspiracy. We therefore affirm the jury's verdict convicting Villanueva of 21 U.S.C. §§ 841(a)(1), and 846.

### B. Multiple Conspiracy Jury Instruction

When reviewing a multiple conspiracy jury instruction to which a defendant failed to request or object to at trial, such as the one at issue here, we review only for plain error. *United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982). A variance to an indictment occurs when "the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006) "Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the 'indictment allege[d] one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies.'" *Id.* at 235–36 (emphasis in original) (quoting *Warner*, 690 F.2d at 548).

Essentially, Villanueva claims that multiple separate conspiracies existed, some of which he was not involved in, and therefore the district court should have provided the jury with an instruction explaining that he can only be held responsible for the conspiracy in which he participated. Albeit not in a standalone section titled "multiple conspiracies," the district court instructed the jury "that each defendant is only on trial for the particular crimes charges in the indictment. Your job is limited to deciding whether the government has proved the crimes charged."

Villanueva was charged with conspiracy to distribute five kilograms or more of cocaine in Fayette County, Kentucky, and other areas, between November 2015 and March 1, 2018. To the extent there were other facets to the overall conspiracy to distribute cocaine in the state of Kentucky, such as money laundering, *inter alia*, all facets discussed at Villanueva's trial furthered the conspiracy in which he participated. Evidence of other drug-trafficking related activities provided context and background for the larger conspiracy. "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Warner*, 690 F.2d at 549.

As we discussed in Villanueva's sufficiency of the evidence challenge, the evidence at trial fully supported his conviction. *See* Section II. A. of this opinion. Villanueva's indictment alleges one conspiracy, and the evidence cannot reasonably be construed *only* as supporting a finding of multiple conspiracies. *Caver*, 470 F.3d at 235–36. The jury instructions the district court provided adequately informed the jury that Villanueva could only be convicted of a conspiracy alleged in the indictment of which he was a participant. *See Warner*, 690 F.2d at 551. Therefore, the trial

court's decision not to give such instruction in this case was not plain error and Villanueva was not prejudiced.

## CONCLUSION

In reference to Imanol Penaloza, the district court did not err in its calculation of the drug quantity attributable to Penaloza. The court properly applied base offense level increases for Penaloza's constructive possession of a firearm, and for Penaloza's leadership role in the conspiracy. The district court, as opposed to a jury, was the proper adjudicator of facts related to Penaloza's attributable drug quantity and base level enhancements for sentencing purposes because those facts did not increase his statutory maximum penalty. We therefore **AFFIRM** Penaloza's sentence.

In reference to Efrain Villanueva, the evidence presented at trial sufficiently supported his conviction. Additionally, the district court did not commit plain error by not providing the jury with a multiple conspiracy instruction, as the evidence clearly supported one central conspiracy theory. We therefore **AFFIRM** Villanueva's conviction.